**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| |
|---|
| UNITED STATES OF AMERICA, |
| Plaintiff, |
| v. |
| CLEVELAND THERMAL, LLC, |
| Defendant. |

Civil Action No.

## COMPLAINT

The United States of America ("United States"), by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought against Cleveland Thermal, LLC ("Cleveland Thermal" or "Defendant") pursuant to Sections 113(b) and 167 of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7413(b) and 7477, seeking injunctive relief and civil penalties for violations of: (1) the Prevention of Significant Deterioration ("PSD") provisions of the CAA, 42 U.S.C. §§ 7470–92; (2) the Nonattainment New Source Review ("Nonattainment NSR") provisions of the CAA, 42 U.S.C. §§ 7501–7509a; (3) the regulations under the federally approved and enforceable Ohio State Implementation Plan ("Ohio SIP") that implement the PSD and

Nonattainment NSR regulations; and (4) the Standards of Performance for New Stationary Sources of the CAA, 42 U.S.C. § 7411, and applicable implementing regulations.

2.      Cleveland Thermal is the owner and operator of a facility located at 2274 Canal Rd., Cleveland, Ohio ("Canal Road Facility") that houses three coal-fired boilers that generate steam for distribution to customers in the City of Cleveland.

3.      In June of 2005 and August of 2006, Cleveland Thermal undertook major modifications of Boilers 104 and 101, respectively, at the Canal Road Facility.  Cleveland Thermal did not secure a permit authorizing the modifications and did not install required air pollution control technology for emissions of sulfur dioxide ("$SO_2$") and nitrogen oxides ("$NO_x$").  The modifications were done in violation of the CAA and the Ohio SIP.

4.      Following the modifications, Cleveland Thermal continued to own and operate the modified boilers.  The 2005 and 2006 modifications of Boilers 104 and 101 created an ongoing obligation of Cleveland Thermal to obtain appropriate permits under the CAA and the Ohio SIP and to install and operate state-of-the-art pollution controls, including controls constituting best available control technology and the lowest achievable emission rate, as well as controls required pursuant to the Standards of Performance for New Stationary Sources.

5.      As a result of the operation of Boilers 104 and 101 following the unpermitted modifications and the failure to install appropriate pollution controls, significant amounts of excess $SO_2$ and $NO_x$ pollution have been, and continue to be, released into the air.  These pollutants harm public health and the environment, contributing to premature mortality, asthma attacks, acid rain, smog, and other adverse effects in downwind communities and natural areas.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 113(b) and 167 of the CAA, 42 U.S.C. §§ 7413(b) and 7477, and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

7.      Venue is proper in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b), (c), and 1395(a), because the violations which constitute the basis of this Complaint have occurred and are occurring in this District and the Canal Road Facility which is owned and operated by Cleveland Thermal is located in this District.

**NOTICES**

8.      On October 28, 2010, and June 29, 2011, EPA issued Notices and Findings of Violation ("NOVs/FOVs") to Cleveland Thermal for violations of the CAA and the Ohio SIP, in accordance with CAA Section 113(a)(1), 42 U.S.C. § 7413(a)(1).  Pursuant to 42 U.S.C. § 7413(a)(1), EPA provided copies of the NOVs/FOVs to the State of Ohio.

9.      The 30-day period between issuance of the NOVs/FOVs and the commencement of this civil action, as required under 42 U.S.C. § 7413(a), has elapsed.

10.      The United States has provided notice of the commencement of this action to the Ohio Environmental Protection Agency ("Ohio EPA") as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

**AUTHORITY**

11.      Authority to bring this action is vested in the Attorney General of the United States by Section 305 of the CAA, 42 U.S.C. § 7605, and pursuant to 28 U.S.C. §§ 516 and 519.

3

**THE DEFENDANT**

12.     Cleveland Thermal is the owner and operator of the Canal Road Facility and the boilers housed therein.

13.     Cleveland Thermal is a Limited Liability Company registered in the State of Ohio and authorized to do business in Ohio.

14.     Cleveland Thermal is a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

**STATUTORY AND REGULATORY BACKGROUND**

15.     The Clean Air Act is designed to protect and enhance the quality of the nation's air, so as to promote the public health and welfare and the productive capacity of its population. CAA Section 101(b)(1), 42 U.S.C. § 7401(b)(1).

**I.      NATIONAL AMBIENT AIR QUALITY STANDARDS**

**A.      General**

16.     Section 108(a) of the CAA, 42 U.S.C. § 7408(a), requires EPA to list, and issue air quality criteria for, each air pollutant, the emissions of which may endanger public health or welfare and the presence of which results from numerous or diverse mobile or stationary sources.

17.     Section 109(a) of the CAA, 42 U.S.C. § 7409, requires EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS") for those air pollutants for which air quality criteria have been issued pursuant to Section 108 of the CAA.  Under Section 109(b) of the CAA, 42 U.S.C. § 7409(b), the primary NAAQS are to be adequate to protect the public health with an adequate margin of safety, and the secondary NAAQS are to be adequate to protect the public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

18.     Pursuant to Sections 108 and 109 of the CAA, 42 U.S.C. §§ 7408 and 7409, EPA has listed and issued air quality criteria and NAAQS for, *inter alia*, $SO_2$ and nitrogen dioxide ("$NO_2$") (which is a nitrogen oxide, or "$NO_x$," compound).  The NAAQS for these pollutants are set forth in 40 C.F.R. §§ 50.4, 50.5, and 50.11.

19.     Pursuant to Section 107(d) of the CAA, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is an "attainment" area.  An area that does not meet the NAAQS is a "nonattainment" area.  An area that cannot be classified due to insufficient data is "unclassifiable."  Air quality designations for states are approved by EPA and located at 40 C.F.R. Part 81.

20.     The Canal Road Facility is located in Cuyahoga County, Ohio.  At the time of the modifications that are the subject of this Complaint (*i.e.*, 2005 and 2006), the Canal Road Facility was located in an area that was designated as being either in attainment or unclassifiable for $SO_2$ and in nonattainment for $NO_x$.

**B.      State Implementation Plans**

21.     Section 110 of the CAA, 42 U.S.C. § 7410, requires each State to adopt and submit to EPA for approval a plan that provides for the attainment and maintenance of the NAAQS in each air quality control region within each state.

22.     An "applicable implementation plan" for a state is the implementation plan, or the most recent revision thereof, which has been approved by EPA pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, or promulgated by EPA pursuant to Section 110(c) of the CAA, 42 U.S.C. § 7410(c), and which implements the relevant requirements of the CAA.  42 U.S.C.

§ 7602(q). After such provisions are approved and/or promulgated by EPA, these provisions constitute a state implementation plan or "SIP." A SIP is enforceable by the respective state in which it applies, and, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), by the United States.

### C. Prevention of Significant Deterioration ("PSD") Requirements

#### 1. PSD Program in General

23. Part C of Title I of the CAA, 42 U.S.C. §§ 7470–7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process. 42 U.S.C. § 7470.

24. The PSD provisions of the Clean Air Act and the regulations promulgated thereunder establish requirements that begin in the preconstruction phase of a potential increase in air pollution and continue for the operational life of a source, thus establishing requirements for the lawful operation of the source following construction or modification.

25. Section 165(a)(1) of the CAA, 42 U.S.C. § 7475(a)(1), prohibits the construction and operation of a "major emitting facility" in an area designated as attainment or unclassifiable unless, among other things, a permit has been issued that comports with the requirements of Section 165 of the CAA (typically called a "PSD permit").

26.     A "major emitting facility" includes any source "with a potential to emit two hundred and fifty tons per year or more of any pollutant."  42 U.S.C. § 7479(1).

27.     The term "construction" includes a modification (as defined in 42 U.S.C. § 7411(a)) of any source or facility.  42 U.S.C. § 7479(2)(C).

28.     A "modification" is "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  42 U.S.C. § 7411(a).

29.     In addition to the requirement to secure a PSD permit, Section 165(a)(4) of the CAA, 42 U.S.C. § 7475(a)(4), prohibits the construction and operation of a major emitting facility unless, among other things, the facility applies best available control technology ("BACT") for each pollutant subject to regulation under the CAA that is emitted from the facility.

30.     BACT is defined, in pertinent part, as "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility. . . ."  42 U.S.C. § 7479(3).

31.     "The owner or operator of each … modified stationary source which is required to obtain a [PSD] permit must show … that the technological system of continuous emission reduction which is to be used will enable such source to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter [*i.e.,* Chapter I of the CAA]."  42 U.S.C. § 7410(j).

7

32.     The owner or operator also must demonstrate that emissions from the construction

or operation of the facility will not cause, or contribute to, non-compliance with applicable air

quality standards or any other applicable emission or performance standard.  42 U.S.C.

§ 7475(a)(3).

### 2.     PSD Regulations Applicable in this Case

33.     Sections 110(a) and 161 of the CAA, 42 U.S.C. §§ 7410(a) and 7471, require that

each state implementation plan have emission limitations and such other measures as may be

necessary to prevent significant deterioration of air quality in areas designated as attainment or

unclassifiable.

34.     A state may comply with Sections 110(a) and 161 of the CAA, 42 U.S.C.

§§ 7410(a) and 7471, by having its own PSD regulations approved by EPA as part of its SIP.  In

that case, the state PSD regulations must be at least as stringent as the federal regulations.  If a

state does not have a PSD program that has been approved by EPA and incorporated into the

state's SIP, then the federal PSD regulations set forth at 40 C.F.R. § 52.21 are incorporated by

reference into the SIP.  40 C.F.R. § 52.21(a).

35.     On August 7, 1980 EPA disapproved Ohio's proposed PSD program and

incorporated by reference into the Ohio SIP the federal PSD regulations of 40 C.F.R. § 52.21(b)

through 52.21(w).  45 Fed. Reg. 52741 (August 7, 1980); 40 C.F.R. § 52.1884.  On January 29,

1981, EPA delegated to Ohio the authority to implement the federal PSD program that had

previously been incorporated into the Ohio SIP.  46 Fed. Reg. 9580 (August 7, 1980).

36.     On October 10, 2001, EPA conditionally approved the Ohio SIP for PSD

provisions for attainment areas.  66 Fed. Reg. 51,570.  On January 22, 2003, EPA approved the

remaining portions of Ohio's PSD provisions.  68 Fed. Reg. 2909.  Ohio's PSD program is

located in Ohio Administrative Code Rules 3745-31-01 through 3745-31-20.  These rules mirror the federal PSD regulations codified in 40 C.F.R Part 52 in the 1999 edition of the Code of Federal Regulations.  All citations to the PSD regulations in this Complaint refer to the provisions of 40 C.F.R. § 52.21 that were in effect in the Ohio SIP at the time of the alleged violations.

### 3.    Requirements of the Applicable PSD Regulations

37.    Under the applicable PSD regulations, "no stationary source or modification to which the requirements of paragraphs (j) through (r) of [40 C.F.R. § 52.21] apply shall begin actual construction without a permit which states that the stationary source or modification would meet those requirements."  40 C.F.R. § 52.21(i)(1) (1999).  With certain exceptions not applicable here, the requirements of paragraphs (j) through (r) "apply to any major stationary source and any major modification with respect to each pollutant subject to regulation under the Act."  40 C.F.R. § 52.21(i)(2) (1999).

38.    "Major stationary source" is defined to include "any stationary source which emits, or has the potential to emit, 250 tons per year or more of any air pollutant subject to regulation under the Act."  40 C.F.R. § 52.21(b)(1)(i)(*b*) (1999).

39.    "Major modification" is defined as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act."  40 C.F.R. § 52.21(b)(2)(i) (1999).

40.    "Net emissions increase" means "the amount by which the sum of the following exceeds zero:  (a) [a]ny increase in actual emissions [as defined by 40 C.F.R. § 52.21(b)(21)] from a particular physical change or change in the method of operation at a stationary source; and (b) [a]ny other increases and decreases in actual emissions [as defined by 40 C.F.R.

§ 52.21(b)(21)] at the source that are contemporaneous with the particular change and are otherwise creditable."  40 C.F.R. § 52.21(b)(3)(i) (1999).

      41.     "Significant" means the following amounts for the following pollutants:

        $SO_2$    40 tons per year ("tpy")
        $NO_x$    40 tpy

40 C.F.R. § 52.21(b)(23)(i) (1999).

      42.     In addition to the requirement to secure a PSD permit, and consistent with Section 165(a)(4) of the CAA, 42 U.S.C. § 7475(a)(4), if a major modification triggers the requirements of the PSD program, the major modification must apply BACT for each pollutant subject to regulation under the Act for which it would result in a significant net emissions increase at the source.  40 C.F.R. § 52.21(j)(3) (1999).  This requirement applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit.  *Id.*  This requirement creates an ongoing obligation to meet BACT emissions limitations.

      43.     Under the applicable PSD regulations, BACT is defined, in pertinent part, as "an emission limitation (including a visible emission standard) based on the maximum degree of reduction for each pollutant subject to regulation under [the] Act which would be emitted from any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification . . . ."  40 C.F.R. § 52.21(b)(12) (1999).

      44.     In addition to securing a PSD permit and installing and operating control technology that meets BACT emissions limitations, the PSD regulations require the owner or operator of the proposed source or modification to demonstrate, before construction begins, that the proposed source or modification will not cause or contribute to air pollution that is in

violation of any national ambient air quality standard or the maximum allowable increase in

emissions of that pollutant.  40 C.F.R. § 52.21(k) (1999).

45.    The PSD regulations also require that any application for a PSD permit must be

accompanied by an analysis of ambient air quality in the area which would be affected.  40

C.F.R. § 52.21(m) (1999).

46.    The PSD regulations also require that the owner or operator of the proposed

source or modification submit all information necessary to perform any analysis or make any

determination required under the PSD regulations.  40 C.F.R. § 52.21(n) (1999).

**D.    Nonattainment New Source Review ("Nonattainment NSR") Requirements**

**1.    Nonattainment NSR Program in General**

47.    Part D of Title I of the CAA, 42 U.S.C. §§ 7501-7515, sets forth provisions

relating to what are commonly referred to as "New Source Review" requirements applicable to

nonattainment areas.  The Nonattainment NSR program is intended, inter alia, to reduce

emissions of air pollutants in areas that have not attained the NAAQS

48.    Part D directs states to include in their SIPs requirements to provide for

reasonable progress towards attainment of the NAAQS in nonattainment areas.  42 U.S.C.

§ 7502(c)(2).

49.    Part D at Section 172(c)(5) of the CAA, 42 U.S.C. § 7502(c)(5), describes the

core of the Nonattainment NSR Program.  Under Section 172(c)(5), all state SIPs must require

permits for the construction and operation of new or modified major stationary sources anywhere

in a nonattainment area within the state.  These Nonattainment NSR permits must be issued in

accordance with Section 173 of the CAA, 42 U.S.C. § 7503.

50.     EPA has promulgated regulations that prescribe the elements that all state SIPs must include in their Nonattainment NSR permit programs.  40 C.F.R. § 51.165.  EPA also has issued an "Interpretative Ruling" that clarifies the requirements necessary for the approval of any permit in a nonattainment area.  40 C.F.R. Part 51, Appendix S, Part IV.

### 2.     Nonattainment NSR Program in Ohio

51.     A state may comply with Sections 172 and 173 of the CAA by having its Nonattainment NSR regulations approved by EPA as part of its SIP.  These provisions must be at least as stringent as those set forth at 40 C.F.R. § 51.165 and must comply with 40 C.F.R. Part 51, Appendix S, Part IV

52.     On January 10, 2003, EPA approved Ohio's Nonattainment NSR rules as part of its SIP.  68 Fed. Reg. 1366.  Ohio's Nonattainment NSR program is located in Ohio Administrative Code Rules 3745-31-21 through 3745-31-27.  In all respects relevant to this Complaint, the Nonattainment NSR rules of Ohio that are applicable to this action closely mirror the federal regulations codified at 40 C.F.R. § 51.165 and 40 C.F.R. Part 51, Subpart S, Part IV. All citations to the Nonattainment NSR regulations in this Complaint refer to the provisions that were in effect in the Ohio SIP at the time of the alleged violations.

### 3.     Requirements of Applicable Nonattainment NSR Rules

53.     Under the Nonattainment NSR requirements relevant to the allegations in this Complaint, no new major stationary source or major modification may be issued a permit to construct unless certain requirements are met.  40 C.F.R. Part 51, Appendix S, Section IV.A.

54.     "Major stationary source" includes, *inter alia*, any stationary source that has the potential to emit 100 TPY or more of any regulated NSR pollutant.  40 C.F.R. § 51.165(a)(1)(iv)(A).

12

55.     For the pollutants at issue in this Complaint ($SO_2$ and $NO_x$), the term "major modification" and the terms used within that definition—"significant," and "net emissions increase"—have the same meanings as those set forth in Paragraphs 39–41.

56.     If a new major stationary source or major modification triggers the requirements of the Nonattainment NSR program, the owner and/or operator must obtain a Nonattainment NSR permit that among other things:  (a) secures federally enforceable emission offsets that are at least as great as the new or modified source's emissions; (b) installs and operates the lowest achievable emission rate ("LAER") as defined in Section 171(3) of the CAA, 42 U.S.C. § 7501(3); and (c) analyzes alternative sites, sizes, production processes, and environmental control techniques for the proposed source and demonstrate that the benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.  42 U.S.C. §§ 7503(a)–(c); 40 C.F.R. Part 51, Appendix S, Part IV, Conditions 1–4.

## II.     NEW SOURCE PERFORMANCE STANDARDS

### A.     General

57.     Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish and periodically revise a list of categories of stationary sources including those categories that, in EPA's judgment, cause or contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare.

58.     Once a category is included on the list, Section 111(b)(1)(B) of the CAA, 42 U.S.C. §7411(b)(1)(B), requires EPA to promulgate a federal standard of performance for new sources within the category, also known as a New Source Performance Standard ("NSPS").

59.     "New source" is defined as any stationary source, the construction or modification of which is commenced after the publication of the NSPS regulations or proposed NSPS regulations applicable to such sources.  42 U.S.C. § 7411(a)(2).

60.     "Stationary source" is defined as a building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7411(a)(3).

61.     Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of an NSPS after the effective date of the NSPS applicable to such source.

62.     The New Source Performance Standards are located in Part 60 of Title 40 of the Code of Federal Regulations.  All citations to the NSPS in this Complaint refer to the provisions of the NSPS that were in effect at the time of the alleged violations.

**B.     NSPS Subpart A**

63.     Pursuant to Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), EPA promulgated regulations that contain general provisions applicable to all NSPS sources. 40 C.F.R. Part 60, Subpart A, §§ 60.1–60.19 ("Subpart A") (2005).

64.     Under the general provisions, the New Source Performance Standards "apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after date of publication [in Part 60] of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility."  40 C.F.R. § 60.1(a) (2005).

65.     "Affected facility" is defined as "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2 (2005).

66.     "Modification" is defined as "any physical change in, or change in the method of operation of, an existing facility which increases the amount of any air pollutant (to which a standard applies) emitted into the atmosphere by that facility or which results in the emission of any air pollutant (to which a standard applies) into the atmosphere not previously emitted."  40 C.F.R. § 60.2 (2005).  The regulations further state that any physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a standard applies shall be considered a modification within the meaning of Section 111 of the CAA, 42 U.S.C. § 7411.  40 C.F.R. § 60.14(a) (2005).

67.     An "existing facility" is defined as "any apparatus of the type for which a standard is promulgated in this part, and the construction or modification of which was commenced before the date of proposal of that standard."  40 C.F.R. § 60.2 (2005).

68.     Upon modification, an "existing facility" becomes an "affected facility" for which the applicable NSPS must be satisfied.  40 C.F.R. § 60.14(a) (2005).

69.     An owner or operator must furnish written notification to EPA of any physical or operational change to an existing facility which may increase the emission rate of any air pollutant to which a standard applies, postmarked 60 days or as soon as practicable before the change is commenced, with information describing the precise nature of the change, present and proposed emission control systems, productive capacity of the facility before and after the change, and the expected completion date of the change.  40 C.F.R. § 60.7(a)(4) (2005).

70.     The owner or operator of an affected facility must conduct a performance test within 60 days after achieving the maximum production rate at which the affected facility will be operated, but not later than 180 days after initial startup of such facility, and furnish EPA a written report of the results of such performance test.  40 C.F.R. § 60.8(a) (2005).

### C.     <u>NSPS Subpart Db</u>

71.     Pursuant to Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), EPA identified industrial-commercial-institutional steam generating units as one category of stationary sources that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare.

72.     EPA promulgated New Source Performance Standards for industrial-commercial-institutional steam generating units at 40 C.F.R. §§ 60.40b–60.49b.  These provisions collectively are found at, and referred to as, Subpart Db of the NSPS.

73.     The "affected facility" to which Subpart Db applies is each "steam generating unit" that commences construction, modification, or reconstruction after June 19, 1984, and has a heat input capacity from fuels combusted in the steam generating unit of greater than 29 MW (100 million Btu/hour)."  40 C.F.R. § 60.40b(a) (2005).  "MW" means "Megawatt"  and "million Btu/hour" is often written as "MMBtu/hr."

74.     A "steam generating unit" is defined as "a device that combusts any fuel or byproduct/waste to produce steam or to heat water or any other heat transfer medium." 40 C.F.R. § 60.41b (2005).

75.     At the time of the modifications at issue in this Complaint, with certain exceptions that are not applicable here, the owner or operator of a steam generating unit that was subject to NSPS Subpart Db, that combusted coal, and that commenced a modification after February 28, 2005, was prohibited from discharging into the atmosphere any gases that contained $SO_2$ in excess of:  (i) either 0.20 lb of $SO_2$ per MMBtu heat input or 8 percent (0.08) of the potential $SO_2$ emission rate (92 percent reduction) from Boilers 101 and 104; and (ii) 1.2 lb of $SO_2$ per MMBtu heat input.  40 C.F.R. § 60.42b(k)(1) (2005).

### III.    ENFORCEMENT OF THE CAA

76.     Sections 113(a)(1) and (a)(3) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (a)(3), authorize EPA to bring a civil action under Section 113(b) whenever, on the basis of any information available, EPA finds that any person has violated, or is in violation of, any requirement or prohibition of, among other things: (1) the PSD requirements of CAA Section 165(a), 42 U.S.C. § 7475(a); (2) the federally enforceable provisions of a SIP or any permit issued thereunder; and (3) the New Source Performance Standards.

77.     Section 167 of the CAA, 42 U.S.C. § 7477, authorizes EPA to initiate an action for injunctive relief, as necessary, to prevent the construction, modification, or operation of a major emitting facility that does not conform to the PSD requirements in Part C of the CAA.

78.     40 C.F.R. § 52.23 provides, among other things, that any failure by a person to comply with any provision of 40 C.F.R. Part 52, or with any approved regulatory provision of a SIP, shall render such person in violation of the applicable SIP and subject to enforcement action pursuant to CAA Section 113, 42 U.S.C. § 7413.

79.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Administrator to initiate a judicial enforcement action against "the owner or operator of an affected source, a major emitting facility, or a major stationary source" or "any other person" for the purpose of restraining a violation, requiring compliance, assessing and recovering a civil penalty, and awarding any other appropriate relief for each violation.

80.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA.  However, the Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 *et seq*., as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 *et seq*., requires EPA to periodically adjust its civil

penalties for inflation.  On December 31, 1996, February 13, 2004, and December 11, 2008, EPA

adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation,"

40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under Section 113 of the CAA.

For each violation that occurs between January 31, 1995, and March 15, 2004, inclusive,

penalties of up to $27,500 per day may be assessed; for each violation that occurs between

March 16, 2004, and January 12, 2009, inclusive, penalties of up to $32,500 per day may be

assessed; and for each violation that occurs on and after January 13, 2009, penalties of up to

$37,500 per day may be assessed.  61 Fed. Reg. 69,360 (Dec. 31, 1996); 69 Fed. Reg. 7,121

(Feb. 12, 2004); 73 Fed. Reg. 75,340 (Dec. 11, 2008).

## GENERAL ALLEGATIONS

81.     Cleveland Thermal owns and operates the Canal Road Facility.

82.     The Canal Road Facility is a coal-fired steam generating station that consists of

three chain-grate wet-bottom boilers numbered 101, 102, and 104 that were originally

constructed in 1948.  The design heat input capacity of each Boiler is 228 MMBtu/hr.

83.     In June of 2005 and August of 2006, Boilers 104 and 101, respectively, were

modified.  Both before and after the modifications, Boilers 104 and 101 have burned coal to

generate steam for distribution to customers.

84.     At all times relevant to this Complaint, Boilers 104 and 101 each have emitted or

have had the potential to emit 250 tons per year or more of $SO_2$ and $NO_x$.

85.     The operation of the Canal Road Facility causes the emission of air pollutants into

the atmosphere, including but not limited to $SO_2$ and $NO_x$.

18

86.     At all times relevant to this Complaint, the Canal Road Facility, Boiler 101, and Boiler 104 each were a "major emitting facility" and a "major stationary source" within the meaning of the CAA and the PSD regulations in the Ohio SIP.

87.     At all times relevant to this Complaint, the Canal Road Facility, Boiler 101, and Boiler 104 each were a "stationary source" within the meaning of the CAA and the NSPS regulations promulgated thereunder.

## FIRST CLAIM FOR RELIEF

(PSD and Nonattainment NSR Violations resulting from modifications to Boilers 101 and 104)

88.     Paragraphs 1–87 are realleged and incorporated herein by reference.

89.     In June through November of 2005, Cleveland Thermal undertook a major modification of Boiler 104 by partially retubing that Boiler's economizer.  In April through August of 2006, Cleveland Thermal undertook a major modification of Boiler 101 by completely retubing that Boiler's economizer.

90.     The physical changes and/or changes in the method of operation of Boilers 104 and 101 that occurred in 2005 and 2006 constituted a "major modification" of each Boiler within the meaning of the PSD and Nonattainment NSR regulations.

91.     The "major modifications" resulted in "significant net emissions increases" in $SO_2$ and $NO_x$ within the meaning of the PSD and Nonattainment NSR regulations.

92.     From the commencement of the Boiler 101 and 104 modifications to the present, Cleveland Thermal has not complied with any of the PSD requirements that were triggered by the 2005 and 2006 modifications.  Among other things, Cleveland Thermal:  (i) undertook the modification of the Boilers without obtaining a PSD permit for the construction and operation of modified Boilers; (ii) failed to undergo a BACT determination for Boilers 101 and 104; (iii) failed to install pollution controls on Boilers 101 and 104 meeting BACT emissions

19

limitations for $SO_2$; (iv) failed to operate Boilers 101 and 104 in compliance with BACT emission limitations for $SO_2$; and (v) continued to operate Boilers 101 and 104 without meeting BACT emission limitations, without complying with all PSD requirements, and without having PSD requirements incorporated into an operating permit as required by the CAA and the Ohio SIP.

93.     From the commencement of the Boiler 101 and 104 modifications to the present, Cleveland Thermal has not complied with any of the Nonattainment NSR requirements that were triggered by the 2005 and 2006 modifications.  Among other things, Cleveland Thermal: (i) undertook the modification of the Boilers without obtaining a Nonattainment NSR permit for the construction and operation of modified Boilers; (ii) failed to undergo a LAER determination for Boilers 101 and 104; (iii) failed to install pollution controls on Boilers 101 and 104 meeting LAER emissions limitations for $NO_x$; (iv) failed to operate Boilers 101 and 104 in compliance with LAER emission limitations for $NO_x$; (v) continued to operate Boilers 101 and 104 without meeting LAER emission limitations, without complying with all Nonattainment NSR requirements, and without having Nonattainment NSR requirements incorporated into an operating permit as required by the CAA and the Ohio SIP; and (vi) failed to secure emissions reductions (offsets) from existing sources in the same area where the Canal Road Facility is located such that there would be reasonable progress toward attainment of the applicable NAAQS.

94.     From the commencement of the Boiler 101 and 104 modifications to the present, for each day that the PSD and Nonattainment NSR regulations have not been complied with, an ongoing obligation to, *inter alia*, apply BACT for $SO_2$ and LAER for $NO_x$ and otherwise comply with the PSD and Nonattainment NSR requirements in the CAA and the Ohio SIP has arisen.

20

The failure to apply BACT and LAER and fully comply with all PSD and Nonattainment NSR requirements has manifested itself anew each day modified Boilers 101 and 104 have operated without BACT limits on $SO_2$ emissions and without LAER limits on $NO_x$ emissions.

95. As a result of the acts and omissions of alleged in the preceding Paragraphs, Cleveland Thermal has violated and continues to violate Sections 165(a), 172(c)(5), and 173(a)-(c) of the CAA, 42 U.S.C. §§ 7475(a), 7502(c)(5), and 7503(a)-(c), and the PSD and Nonattainment NSR provisions of the Ohio SIP.

96. Unless restrained by an order of this Court, the violations alleged in this claim and similar violations will continue.

97. Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Adjustment Act of 1990, the violations alleged in this claim subject Cleveland Thermal to injunctive relief, including mitigation of the effects of excess emissions, and civil penalties of up to: (i) $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and (ii) $37,500 per day for each violation after January 12, 2009.

## SECOND CLAIM FOR RELIEF
(NSPS violations resulting from modifications to Boilers 101 and 104)

98. Paragraphs 1–87 and 89 are realleged and incorporated herein by reference.

99. Prior to the physical changes and/or changes in the method of operation of Boilers 101 and 104 in 2005 and 2006 as described in Paragraph 89, Boilers 101 and 104 were each an "existing facility" within the meaning of the NSPS. 40 C.F.R. § 60.2 (2005).

100. The physical changes and/or changes in the method of operation of Boilers 101 and 104 as described in Paragraph 89 resulted in an increase in the hourly emission rate to the atmosphere of $SO_2$.

21

101.     The physical changes and/or changes in the method of operation of Boilers 101 and 104 as described in Paragraph 89 constituted a "modification" within the meaning of the NSPS.  40 C.F.R. § 60.14(a) (2005).

102.     Upon modification, Boilers 101 and 104 each became an "affected facility" within the meaning of Subpart A of the NSPS, 40 C.F.R. § 60.14 (2005).

103.     Upon modification, Boilers 101 and 104 each became commercial "steam generating units" within the meaning of Subpart Db of the NSPS, 40 C.F.R. §§ 60.40b–60.49b (2005), and became subject to Subpart Db of the NSPS.

104.     From November of 2005 for Boiler 104 and from August of 2006 for Boiler 101, Cleveland Thermal has discharged into the atmosphere gases that contain $SO_2$ in excess of (i) either 0.20 lb of $SO_2$ per MMBtu or 8 percent (0.08) of the potential $SO_2$ emission rate (92 percent reduction) and (ii) in excess of 1.2 lb/MMBtu.  40 C.F.R. § 60.42b(k)(1) (2005).  These discharges were and continue to be in violation of 40 C.F.R. § 60.42b(k)(1) (2005).

105.     Unless restrained by an order of this Court, the violations alleged in this claim and similar violations will continue.

106.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Adjustment Act of 1990, the violations alleged in this claim subject Cleveland Thermal to injunctive relief, including mitigation of the effects of excess emissions, and civil penalties of up to: (i) $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and (ii) $37,500 per day for each violation after January 12, 2009.

## PRAYER FOR RELIEF

WHEREFORE, based upon all the allegations set forth above, the United States requests that this Court:

1. Permanently enjoin Cleveland Thermal from operating Boilers 101 and 104 except in accordance with the Clean Air Act and any applicable regulatory requirements;

2. Order Cleveland Thermal to apply for permits that are in conformity with the requirements of the PSD and Nonattainment NSR program;

3. Order Cleveland Thermal to remedy its past violations by, among other things, requiring Cleveland Thermal to install and/or operate BACT for $SO_2$ and LAER for $NO_x$ at Boilers 101 and 104 for each pollutant in violation of the new source review requirements of the Clean Air Act and by requiring Cleveland Thermal to operate in compliance with Subparts A and Db of the New Source Performance Standards of the Clean Air Act;

4. Order Cleveland Thermal to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged above;

5. Assess a civil penalty against Cleveland Thermal of up to: (i) $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and (ii) $37,500 per day for each violation after January 12, 2009;

6.  Award the United States its costs of this action; and,

7.  Grant such other relief as the Court deems just and proper.

Respectfully submitted,


JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

ANNETTE M. LANG
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20530
(202) 514-4213
(202) 616-6584 (fax)
annette.lang@usdoj.gov



STEVEN M. DETTELBACH
United States Attorney
Northern District of Ohio


By:     s/ Steven J. Paffilas
        STEVEN J. PAFFILAS
        Assistant U.S. Attorney
        Reg. No. 0037376
        United States Courthouse
        801 W. Superior Ave.
        Suite 400
        Cleveland, OH  44113
        (216) 622-3698
        (216) 522-4982 (fax)
        steven.paffilas@usdoj.gov

OF COUNSEL:

Mary T. McAuliffe
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Boulevard (C-14J)
Chicago, IL  60604