**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

CLEVELAND THERMAL, LLC,

        Defendant.

Civil Action No. 1:15-cv-2198

**<u>CONSENT DECREE</u>**

## **TABLE OF CONTENTS**

I.     JURISDICTION AND VENUE ....................................................................3

II.    APPLICABILITY ........................................................................................4

III.   DEFINITIONS ............................................................................................5

IV.   COMPLIANCE REQUIREMENTS...........................................................14

     A.  Interim Compliance Measures at the Canal Road Facility ...........................14

     B.  Retirement of All Boilers at the Canal Road Facility and Boilers 5
         and 6 at the Hamilton Avenue Facility ......................................................16

     C.  Operation and Maintenance of Boilers 1, 2, and 3 at the Hamilton
         Avenue Facility as Limited-Use Boilers; Retirement of One
         of the Three ..............................................................................................17

     D.  Replacement Natural Gas Boiler ................................................................18

     E.  New Natural Gas Boilers at the Hamilton Avenue Facility.........................19

     F.  Optional New Natural Gas Cogeneration Facility ......................................22

     G.  System-Wide Tonnage Limitations ...........................................................24

     H.  Stack Tests for $NO_x$, $SO_2$ and PM.............................................................25

     I.  CEMS.......................................................................................................26

V.    PROHIBITION ON THE USE OF CONSENT DECREE EMISSION
      REDUCTIONS ..........................................................................................28

VI.   ENVIRONMENTAL MITIGATION PROJECTS.........................................29

VII.  CIVIL PENALTY......................................................................................31

VIII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS.........................32

IX.   PERIODIC REPORTING..........................................................................34

X.    REVIEW AND APPROVAL OF SUBMITTALS ..........................................35

XI.     STIPULATED PENALTIES ........................................................................................37

XII.    FORCE MAJEURE ..................................................................................................46

XIII.   DISPUTE RESOLUTION .........................................................................................48

XIV.    PERMITS...................................................................................................................50

XV.     INFORMATION COLLECTION AND RETENTION ....................................................51

XVI.    NOTICES...................................................................................................................53

XVII.   EFFECTIVE DATE ....................................................................................................55

XVIII.  RETENTION OF JURISDICTION ..............................................................................56

XIX.    MODIFICATION ........................................................................................................56

XX.     INTEGRATION ..........................................................................................................56

XXI.    COSTS ......................................................................................................................56

XXII.   SIGNATORIES AND SERVICE.................................................................................57

XXIII.  PUBLIC COMMENT ..................................................................................................57

XXIV.   TERMINATION...........................................................................................................58

XXV.    FINAL JUDGMENT ...................................................................................................59


APPENDIX A        Environmental Mitigation Projects

APPENDIX B        Notices and Findings of Violation:
                  EPA 5 11 OH 02 (October 28, 2010)
                  EPA 5 11 OH 11 (June 29, 2011)

## CONSENT DECREE

WHEREAS, concurrently with the lodging of this Consent Decree, Plaintiff United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), has filed a complaint ("Complaint") against Cleveland Thermal, LLC ("Cleveland Thermal" or "Defendant"), an Ohio limited liability company doing business in Ohio, for injunctive relief and civil penalties pursuant to Section 113(b) of the Clean Air Act (the "CAA" or "Act"), 42 U.S.C. § 7413(b);

WHEREAS the Complaint alleges, among other things, that since at least 1987, Cleveland Thermal, or its predecessors, has owned and operated a steam-generating facility located at 2274 Canal Rd, Cleveland, Ohio ("Canal Road Facility"), which houses three coal-fired boilers:   Boilers 101, 102, and 104;

WHEREAS the Complaint alleges that Boiler 101 underwent major modifications in August 2006 after an extended shutdown, which resulted in significant net emissions increases of sulfur dioxide ("$SO_2$") and nitrogen oxides ("$NO_x$") in violation of Sections 165, 172 and 173 of the CAA, 42 U.S.C. §§ 7475, 7502, and 7503, and 40 C.F.R. §§ 51.166 and 52.21;

WHEREAS the Complaint alleges that Boiler 104 underwent major modifications in June 2005 after an extended shutdown, which resulted in significant net emissions increases of $SO_2$ and $NO_x$ in violation of Sections 165, 172 and 173 of the CAA, 42 U.S.C. §§ 7475, 7502, and 7503, and 40 C.F.R. §§ 51.166 and 52.21;

WHEREAS the Complaint alleges that Cleveland Thermal has not complied with any of the Prevention of Significant Deterioration ("PSD") or non-attainment New Source Review ("NA-NSR") regulations that were triggered by the 2006 modification of Boiler 101 and the 2005 modification of Boiler 104 because, among other things: (i) the modifications of

1

Boilers 101 and 104 were undertaken without obtaining a PSD or NA-NSR permit for the construction and operation of modified Boilers 101 and 104; (ii) no evaluation of Best Available Control Technologies ("BACT") or Lowest Available Emissions Rate ("LAER") was undertaken for Boilers 101 and 104; (iii) no pollution controls on Boilers 101 and 104 meeting BACT for $SO_2$ were installed and no pollution controls on Boilers 101 and 104 meeting LAER for $NO_x$ were installed; and (iv) Boilers 101 and 104 have continued to operate without meeting BACT emission limitations for $SO_2$ and LAER emission limitations for $NO_x$, respectively, without complying with all PSD and NA-NSR requirements, and without having PSD and NA-NSR requirements incorporated into an operating permit as required by the CAA and the Ohio State Implementation Plan ("Ohio SIP") promulgated pursuant to the CAA;

WHEREAS the Complaint further alleges that, with respect to Boilers 101 and 104, Cleveland Thermal failed to comply with various requirements of the New Source Performance Standards ("NSPS") for certain steam generating units found at 40 C.F.R. Part 60, Subpart Db, including monitoring requirements;

WHEREAS Cleveland Thermal does not admit the violations alleged in the Complaint and does not admit any liability to the United States arising out of the occurrences alleged in the Complaint;

WHEREAS, since at least 2004, Cleveland Thermal has owned and operated a steam-generating facility located at 1921 Hamilton Avenue, Cleveland, Ohio, 44114 ("Hamilton Avenue Facility"), which houses four fuel oil-fired boilers, specifically, Boilers 1, 2, 3, and 5, and one oil and natural gas-fired boiler, designated as Boiler 6;

WHEREAS, pursuant to Paragraph 21.a, Cleveland Thermal will install and commence Operation of a natural gas-fired Boiler ("Replacement Natural Gas Boiler") at the Hamilton

Avenue Facility on November 30, 2015, that will be cheaper to Operate than any other Boiler in the System, thereby giving Cleveland Thermal an incentive to maximize the use of the Replacement Natural Gas Boiler until additional natural-gas fired Boilers are installed and operational on or before January 31, 2017, pursuant to the requirements of Paragraph 22.d;

WHEREAS, in order to settle this case and avoid complicated, protracted and expensive litigation, Cleveland Thermal has entered into this Consent Decree, but nothing in this Consent Decree constitutes an admission or evidence of, or shall be treated as an admission or evidence of, any violation of law in any other litigation or forum;

WHEREAS the United States provided Cleveland Thermal and the State of Ohio with actual notice of alleged violations and of the commencement of this action in accordance with Section 113(a)(1) and (b) of the CAA, 42 U.S.C. § 7413(a)(1) and (b), respectively;

WHEREAS the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith and at arm's length, that it will avoid prolonged litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.  **JURISDICTION AND VENUE**

1.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Sections 113(b) and 167 of the CAA, 42 U.S.C. §§ 7413(b) and 7477, and over the Parties.   Venue lies in this District pursuant to Section 113(b) of the CAA,

42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b), (c), and 1395(a), because the violations alleged in the Complaint have occurred and are occurring in this District and each Facility which is the subject of this action is located in this District. For purposes of this Consent Decree, Cleveland Thermal agrees that the Complaint states claims upon which relief may be granted.

2.      For purposes of this Consent Decree or any action to enforce this Consent Decree, if this Consent Decree is entered by the Court, Cleveland Thermal consents to the Court's jurisdiction over this Consent Decree, over any action to enforce this Consent Decree, and over Cleveland Thermal. Cleveland Thermal also consents to venue in this judicial district.

## II.  **APPLICABILITY**

3.      The obligations of this Consent Decree shall apply to and be binding upon the United States and upon Cleveland Thermal and any successors, assigns, or other entities or persons otherwise bound by law.

4.      No transfer of ownership or operation of a Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Cleveland Thermal of its obligation to ensure that the terms of the Decree are implemented unless: (1) the transferee agrees to undertake the obligations required by this Decree and to be substituted for Cleveland Thermal as a Party under the Decree and thus be bound by the terms thereof; and (2) the United States consents to relieve Cleveland Thermal of its obligations.

5.      At least 30 Days prior to a transfer of ownership of a Facility, Cleveland Thermal shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region 5, the United States Attorney for the Northern District of Ohio, and the United States Department of Justice, in accordance with Section XVI (Notices). Any

attempt to transfer ownership or operation of the Facility without complying with Paragraphs 4 and 5 constitutes a violation of this Decree. The United States' decision as to whether to approve a transfer of ownership shall not be subject to dispute resolution.

6. Cleveland Thermal shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Cleveland Thermal shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

7. In any action to enforce this Consent Decree, Cleveland Thermal shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree, unless it is determined to be a Force Majeure Event governed by Section XII of this Consent Decree.

### III. DEFINITIONS

8. Terms used in this Consent Decree that are defined in the Act or in federal or state regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a. "30-Day Rolling Average Emission Rate" for a Boiler shall be determined by calculating an arithmetic average of all hourly emission rates in lb/mmBTU for the current Boiler Operating Day and all hourly emission rates in lb/mmBTU for the previous 29 Boiler Operating Days. A new 30-Day Rolling Average Emission Rate shall be calculated for each new Boiler Operating Day. Each 30-Day Rolling Average Emission Rate shall include all emissions of the applicable pollutant that

5

occur during all periods within any Boiler Operating Day, including emissions from startup, shutdown, and Malfunction.

b. "Annual Capacity Factor" means the ratio between the actual heat input to a boiler from the fuels burned during a calendar year and the potential heat input to the boiler had it been operated for 8,760 hours during a year at the maximum steady state design heat input capacity.

c. "Boiler" means, collectively, the stationary equipment that feeds Fossil Fuel to the boiler, the boiler that produces steam, and all ancillary equipment, including pollution control equipment.   A steam-generating facility may be comprised of one or more Boilers.

d. "Boiler 1," "Boiler 2," "Boiler 3," and "Boiler 5" mean each of the oil-fired Boilers located at the Hamilton Avenue Facility and designated as Boiler 1, Boiler 2, Boiler 3, and Boiler 5 in CAA permits issued to the Hamilton Avenue Facility.

e. "Boiler 6" means the oil-fired and natural gas-fired Boiler located at the Hamilton Avenue Facility and designated as Boiler 6 in CAA permits issued to the Hamilton Avenue Facility.

f. "Boiler 101," "Boiler 102," and "Boiler 104" mean each of the coal-fired Boilers located at the Canal Road Facility and designated as Boiler 101, Boiler 102, and Boiler 104 in CAA permits issued to the Canal Road Facility.

g. "Boiler [either 1, 2, 3, 5, 6, 101, 102, or 104] Operating Day" means the following for each of the following Boilers:

**TABLE 1**

| Boiler No. | Meaning |
|---|---|
| 1 | Any day Boiler 1 fires Fossil Fuel |
| 2 | Any day Boiler 2 fires Fossil Fuel |
| 3 | Any day Boiler 3 fires Fossil Fuel |
| 5 | Any day Boiler 5 fires Fossil Fuel |
| 6 | Any day Boiler 6 fires Fossil Fuel |
| 101 | Any day Boiler 101 fires Fossil Fuel |
| 102 | Any day Boiler 102 fires Fossil Fuel |
| 104 | Any day Boiler 104 fires Fossil Fuel |

h.  "Canal Road Facility" means, solely for purposes of this Consent Decree, Cleveland Thermal's facility at 2274 Canal Road, Cleveland, Ohio, which houses the three coal-fired boilers designated as Boilers 101, 102, and 104, each with a maximum rated heat input of 228 mmBTU/hr, as regulated by Title V operating permit number P0094247, in effect as of the Date of Lodging of this Consent Decree.

i.  "CEMS" or "Continuous Emission Monitoring System," means, for obligations involving the monitoring of $NO_x$ emissions under this Consent Decree, the devices defined in 40 C.F.R. § 72.2 and installed and maintained as required by 40 C.F.R. Part 60.

j.  "CD Emission Reductions" shall have the definition provided in Section V (Prohibition on the Use of Consent Decree Emission Reductions).

k.   "Clean Air Act," "CAA," or "Act" means the federal Clean Air Act, 42 U.S.C. §§ 7401–7671q, and its implementing regulations.

l.  "Complaint" means the complaint filed by the United States in this action.

m.  "Consent Decree" or "Decree" or "CD" means this Decree and all appendices attached hereto.

7

n.  "Continuously Operate" or "Continuous Operation" means that when a pollution control technology or combustion control device is required to be used at a Boiler pursuant to this Consent Decree (including, but not limited to, OFA), it shall be operated at all times such Boiler is in operation, except as otherwise provided by Section XII (Force Majeure) or during a Malfunction of the pollution control technology or combustion control device, so as to minimize emissions to the greatest extent practicable, consistent with the technological limitations, manufacturers' specifications, and good engineering and maintenance practices for such equipment and the Boiler.

o.  "Date of Entry of this Consent Decree" or "Date of Entry" means the Effective Date of this Consent Decree as set forth in Section XVII (Effective Date).

p.  "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Northern District of Ohio.

q.  "Day" or "day" (that is, without an initial capitalization) means a calendar day unless expressly stated to be a business day.   In computing any period of time under this Consent Decree for the submission of material(s), where the last day would fall on a Saturday, Sunday, or federal or State of Ohio holiday, the period shall run until the close of business of the next business day.   In computing any period of time under this Consent Decree for the payment of a penalty, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next federal business day.

r.  "Defendant" means Cleveland Thermal, LLC.

s.  "Effective Date" shall have the definition provided in Section XVII (Effective Date).

t.  "Emission Rate" for a given pollutant means the number of pounds of that pollutant emitted per million British thermal units of heat input (lb/mmBTU), measured in accordance with this Consent Decree.

u.  "Environmental Mitigation Projects" or "Projects" means the projects set forth in Section VI (Environmental Mitigation Projects) and Appendix A of this Consent Decree.

v.  "EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

w.  "External Natural Gas Supply Outage" means a loss in the supply of Natural Gas caused by events occurring outside the boundary of the respective Facility where the Boiler(s) in question is (are) located, or, if applicable, the New NG Cogen Plant, excluding Natural Gas supply outages due to an interruptible service agreement.

x.  "Facility" means each of the following individually:   (i) Canal Road Facility (housing Boilers 101, 102, and 104); or (ii) Hamilton Avenue Facility (housing Boilers 1, 2, 3, 5, and 6).

y.  "Fossil Fuel" means any hydrocarbon fuel, including coal, petroleum coke, petroleum oil, or natural gas.

z.  "Greenhouse Gases" means the air pollutant defined at 40 C.F.R. § 86.1818-12(a) as of the Date of Lodging of this Consent Decree as the aggregate group of six greenhouse gases:   carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons and sulfur hexafluoride.   This definition applies until

termination of this Consent Decree even if 40 C.F.R. § 86.1818-12(a) is revised, stayed, vacated, or otherwise modified after the Date of Lodging.

aa.   "Hamilton Avenue Facility" means, solely for purposes of this Consent Decree, Cleveland Thermal's facility at 1921 Hamilton Ave, Cleveland, Ohio, housing four oil-fired boilers designated as Boiler 1 (170 mmBTU/hr), Boiler 2 (170 mmBTU/hr), Boiler 3 (170 mmBTU/hr) and Boiler 5 (220 mmBTU/hr), and one No.-6-oil-fired and natural gas-fired boiler designated as Boiler 6 (220 mmBTU/hr), and all related equipment to those five Boilers, as regulated by Title V operating permit, number P0094247, in effect as of the Date of Lodging of this Consent Decree.

bb.   "lb/mmBTU" means pound per million British thermal units.

cc.   "Limited-Use Boiler" means a boiler that burns any amount of solid, liquid, or gaseous fuels and has a federally enforceable average Annual Capacity Factor of no more than 10 percent.

dd.   "Malfunction" means any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner.   Failures that are caused in part by poor maintenance or careless operation are not Malfunctions.

ee.   "Multiclone" means a mechanical particulate emissions control device consisting of several cyclones in parallel.

ff.   "New NG Cogen Facility" means a natural gas-fired cogeneration facility that Cleveland Thermal elects to construct, pursuant to Paragraph 24, after the Date of Lodging of this Consent Decree that generates electricity and steam solely from

natural gas but which can include an alternative, emergency back-up source utilizing fuel oil in the event of an External Natural Gas Supply Outage.

gg. "New Natural Gas Boilers" means the natural gas-fired boilers with a total capacity of no less than 364,000 mmBTU/lb of steam that Cleveland Thermal is required to install at the Hamilton Avenue Facility pursuant to Paragraph 22 of this Consent Decree.

hh. "$NO_x$" means oxides of nitrogen, measured in accordance with the provisions of this Consent Decree.

ii. "OFA" or "Over-Fire Air" means an in-furnace, staged combustion control to reduce $NO_x$ emissions.

jj. "Ohio EPA" means the Ohio Environmental Protection Agency and any of its successor department or agencies.

kk. "Ohio SIP" means the Ohio State Implementation Plan, and any amendments thereto, as approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410.

ll. "Operate" or "Operating" means to perform actions, with the use of the System's equipment, to generate steam, hot water, or chilled water using any fuel source.

mm. "Paragraph" means a portion of this Consent Decree identified by an Arabic numeral.

nn. "Parties" means the United States and Cleveland Thermal.

oo. "PTI" or "Permit to Install" means a federally enforceable permit issued to a company by Ohio EPA in accordance with Ohio Admin. Code Chapter 3745-31 of the Ohio SIP to allow the installation or modification of an air contaminant source.

11

pp.     "PM" means total filterable particulate matter, measured in accordance with the provisions of this Consent Decree.

qq.     "PM Emission Rate" means the number of pounds of PM emitted per million British thermal unit of heat input (lb/mmBTU).

rr.      "Projects" means the environmental mitigation projects described in Section VI (Environmental Mitigation Projects) and Appendix A to this Consent Decree.

ss.     "Project Dollars" means Cleveland Thermal's expenditures and payments incurred or made in carrying out the environmental mitigation projects identified in Section VI (Environmental Mitigation Projects) and Appendix A to this Consent Decree to that extent that such expenditures or payments both: (i) comply with the requirements set forth in Section VI (Environmental Mitigation Projects) and Appendix A; and (ii) constitute Cleveland Thermal's direct payments for such projects or Cleveland Thermal's external costs for contractors, vendors, and equipment.

tt.     "Render Physically Incapable of Combusting Any Fuel" means, with respect to each of the following Boilers, the following requirements:

i.      Boilers 1, 2, 3, 5, and 6:

- Permanently sever all utility connections by disconnecting the electricity to each Boilers' fans and cutting and capping the feed water supply;
- Permanently disconnect the steam line leading from each Boiler to the Hamilton Avenue steam distribution system; and
- Permanently remove the fuel oil line.

12

      ii.      Boilers 101, 102, and 104:

- Permanently sever all utility connections by disconnecting the electricity to each Boilers' fans and cutting and capping the feed water supply;
- Permanently disconnect the steam line leading from each Boiler to the Canal Road steam distribution system;
- Permanently remove all existing coal feeders to the Boilers; and
- Weld steel plates to each of the opening of the Boilers.

uu.    "Replacement Natural Gas Boiler" means the natural gas-fired boiler that, pursuant to Paragraph 21, Cleveland Thermal is required to install at the Hamilton Avenue Facility to replace Boiler 102 at the Canal Road Facility (which will be Retired).

vv.    "Retire" (or any form of the word, such as "Retirement") means to permanently shut down a Boiler such that the Boiler cannot physically or legally burn Fossil Fuel, and, with respect to the applicable Boiler Owner(s) and/or Boiler Operator, to comply with applicable state and federal requirements for permanently ceasing operation of the Boiler as a Fossil Fuel-fired steam generating Boiler, including applying to Ohio EPA to remove the Boiler from Ohio's air emissions inventory and applying to Ohio EPA to amend all applicable permits so as to reflect the permanent shutdown of such Boiler.

ww.   "Selected Oil-Fired Boiler" means the oil-fired Boiler at the Hamilton Avenue Facility that Cleveland Thermal selects to Retire pursuant to Paragraph 20.   The Selected Oil-Fired Boiler will be either Boiler 1, 2, or 3, pursuant to requirements of Paragraph 20.

xx.    "$SO_2$" means sulfur dioxide, measured in accordance with the provisions of this Consent Decree.

13

yy.    "State" means the State of Ohio.

zz.    "System" means collectively, and solely for purposes of this Consent Decree, the Canal Road Facility, the Hamilton Avenue Facility, and, if and when constructed, the New NG Cogen Facility.

aaa.    "System-Wide Tonnage Limitation" for a pollutant means the sum of the tons of the pollutant emitted from all the Boilers that exist within the System as of the date to which the tonnage limitation applies, including, without limitations, all tons of that pollutant emitted during periods of startup, shutdown, and Malfunction, in the designated time period.

bbb.    "Title V Permit" means Permit No. P0094247 issued to both the Canal Road and Hamilton Avenue Facilities by Ohio EPA pursuant to Subchapter V of the CAA, 42 U.S.C. §§ 7661–7661f, as may be revised or renewed after the Date of Lodging.

ccc.    "United States" means the United States of America, acting on behalf of EPA.

## IV.   COMPLIANCE REQUIREMENTS

### A.   Interim Compliance Measures at the Canal Road Facility

9.   Purchase and Use of Low Sulfur Coal for Boilers 101 and 104.   Commencing no later than 30 Boiler Operating Days from the Date of Entry of this Consent Decree and continuing until such time as Boilers 101 and 104 are Retired pursuant to Paragraph 15, at all times when Boiler 101 and/or Boiler 104 is (are) in Operation and using coal as fuel, Cleveland Thermal shall:

a.    use best efforts to purchase and use the lowest sulfur coal available from local markets; and

b.    only burn coal with a sulfur content that enables Cleveland Thermal to continuously comply with its permitted $SO_2$ emission limit of 1.380 lbs/mmBTU based on the monitoring and recordkeeping requirements in the Title V Permit.

10.    <u>Optimization of Multiclone at the Canal Road Facility</u>.   Commencing no later than 30 Days after the Date of Entry of this Consent Decree and continuing until all Boilers at the Canal Road Facility are Retired, Cleveland Thermal shall Continuously Operate the Multiclone at the Canal Road Facility.   Except as required during correlation testing under 40 C.F.R. Part 60, Appendix B, Performance Specification 11, and Quality Assurance requirements under Appendix F, Procedure 2, Cleveland Thermal, at a minimum and to the extent practicable, shall maintain, inspect and repair the Multiclone consistent with the manufacturer's specifications and shall use good engineering practices.

11.    <u>Interim Emissions Controls and Limitations for Boilers 101 and 104</u>.
Commencing no later than 30 Days after the Date of Entry of this Consent Decree and continuing until Boilers 101 and 104 are Retired pursuant to Paragraph 15, Cleveland Thermal shall comply with the following emissions controls, emission limitations and compliance demonstration methods for each of the following pollutants:

a.    <u>For $NO_x$</u>:  Continuous Operation of the existing OFA system within each Boiler and compliance with and maintenance of a $NO_x$ Emission Rate of no greater than 0.300 lb/mmBTU.   To demonstrate compliance, Cleveland Thermal shall conduct stack testing in accordance with Subparagraph 29.a using a Method specified in Subparagraph 29.b.i of this Consent Decree. This testing shall be undertaken no later than December 31, 2016.

b.    <u>For $SO_2$</u>:   Compliance with a calendar monthly average $SO_2$ Emission Rate of no greater than 1.380 lb/mmBTU based on the monitoring and recordkeeping requirements in the Title V Permit.

c.    <u>For PM</u>:   Continuous Operation of the existing Multiclone within the Canal Road Facility and compliance with and maintenance of a PM Emission Rate of no greater than 0.100 lb/mmBTU.   To demonstrate compliance, Cleveland Thermal shall conduct stack testing in accordance with Subparagraph 29.a using the Methods specified in Subparagraph 29.b.iii of this Consent Decree.   This testing shall be undertaken no later than December 31, 2016.

**B.**     **Retirement of All Boilers at the Canal Road Facility and Boilers 5 and 6 at the Hamilton Avenue Facility**

12.     Boiler 102.   By no later than the earlier of:   (i) 45 Boiler 102 Operating Days after the Date of Entry of this Consent Decree; or (ii) February 1, 2016, Cleveland Thermal shall permanently cease Operating Boiler 102.   By no later than 30 days after ceasing Operation of Boiler 102, Cleveland Thermal shall Render it Physically Incapable of Combusting Any Fuel and shall Retire it.

13.     Boiler 5.   By no later than the earlier of:   (i) 30 Boiler 5 Operating Days after the Date of Entry; or (ii) March 30, 2016, Cleveland Thermal shall permanently cease Operating Boiler 5.   By no later than 30 days after ceasing Operation of Boiler 5, Cleveland Thermal shall Render Boiler 5 Physically Incapable of Combusting any Fuel and shall Retire it.

14.     Boiler 6.   By no later than the earlier of:   (i) 30 Boiler 6 Operating Days after the Date of Entry; or (ii) March 30, 2016, Cleveland Thermal shall permanently cease Operating Boiler 6.   By no later than 30 days after ceasing Operation of Boiler 6, Cleveland Thermal shall Render Boiler 6 Physically Incapable of Combusting any Fuel and shall Retire it.

15.     Boilers 101 and 104.   By no later than January 31, 2017, Cleveland Thermal shall permanently cease Operating Boilers 101 and 104.   By no later than 60 days after ceasing operation of Boilers 101 and 104, Cleveland Thermal shall Render Boilers 101 and 104 Physically Incapable of Combusting Any Fuel and shall Retire them.

16.     Written Requests to Ohio EPA to Revoke Authorizations to Operate.   By no later than the dates set forth in Paragraphs 12–15 for the Retirement of Boilers 101, 102, 104, 5 and 6, and by December 31, 2017, for the Selected Oil-Fired Boiler described in Paragraph 20, Cleveland Thermal shall submit a written request to Ohio EPA to revoke all authorizations contained in any Ohio EPA permit to Operate these Boilers.   Cleveland Thermal's request shall state the specific

16

date that each Boiler ceased Operating.   If, for Boilers 101, 104, and/or the Selected Oil-Fired Boiler, Cleveland Thermal elects to submit its request prior to the dates set forth in Paragraph 15 (for Boilers 101 and 104) or Paragraph 20 (for the Selected Oil-Fired Boiler), then Cleveland Thermal shall state the date that it will cease Operating the Boiler(s) that is (are) the subject of the request.   On the same day that Cleveland Thermal submits its written request to Ohio EPA pursuant to this Paragraph, Cleveland Thermal shall email to EPA at the addresses listed in Section XVI (Notices) of this Decree a copy of the written request (including all attachments).

17.    Notice to EPA.   By no later than 30 days after submitting to Ohio EPA, pursuant to Paragraph 16, a written request to revoke the authorization to Operate the final Boiler that is still Operating (among Boilers 101, 102, 104, 5, 6, and the Selected Oil-Fired Boiler), Cleveland Thermal shall provide written notice to EPA pursuant to Section XVI (Notices) that all Boilers required to permanently cease Operating have, in fact, permanently ceased Operating.

**C.    Operation and Maintenance of Boilers 1, 2, and 3 at the Hamilton Avenue Facility as Limited-Use Boilers; Retirement of One of the Three**

18.    Commencing on the Date of Entry of this Consent Decree and continuing until the earlier of: (i) the Retirement of the Boiler; or (ii) the termination of this Consent Decree, Cleveland Thermal shall comply with the following emission limitations and compliance demonstration methods for Boilers 1, 2, and 3:

a.    SO$_2$ and PM:    The emission limits and compliance demonstration methods set forth in the permit(s) applicable to Boilers 1, 2, and 3;

b.    NO$_x$:    0.260 lb/mmBTU as an average of the three test runs required by annual stack testing conducted in accordance with Subparagraph 29.a using a Method specified in Subparagraph 29.b.i of this Consent Decree.

19.    Commencing no later than January 31, 2017, and continuing until the earlier of: (i) the Retirement of the Boiler; or (ii) the termination of this Consent decree, Cleveland Thermal

shall operate and maintain Boilers 1, 2, and 3 at the Hamilton Avenue Facility as Limited-Use Boilers.

20.    Selected Oil-Fired Boiler.    By no later than December 31, 2017, Cleveland Thermal shall permanently cease Operating either Boiler 1, 2, or 3 at the Hamilton Avenue Facility ("Selected Oil-Fired Boiler").    By no later than 30 days after ceasing Operation of the Selected Oil-Fired Boiler, Cleveland Thermal shall Render the Selected Oil-Fired Boiler Physically Incapable of Combusting Any Fuel and shall Retire it.

**D.    Replacement Natural Gas Boiler**

21.    Replacement Natural Gas Boiler

a.    Deadline.    By no later than November 30, 2015, Cleveland Thermal shall install and commence operation of a natural gas-fired boiler at the Hamilton Avenue Facility ("Replacement Natural Gas Boiler") that already has been properly permitted as of the Date of Lodging of this Consent Decree.

b.    Installation, Calibration, Maintenance, and Continuous Operation of $NO_x$ CEMS on the Replacement Natural Gas Boiler.    By no later than December 31, 2015, Cleveland Thermal shall install, calibrate, maintain, and Continuously Operate a $NO_x$ CEMS on the Replacement Natural Gas Boiler.    For this CEMS, Cleveland Thermal shall comply with Subparagraphs 30.e, 30.f, and 30.g of this Decree.

c.    Replacement Natural Gas Boiler Emission Rates.    Cleveland Thermal shall demonstrate and thereafter maintain continuous compliance with the following Emission Rates from the Replacement Natural Gas Boiler:

i.    $NO_x$:   30-Day Rolling Average $NO_x$ Emission Rate of no greater than 0.100 lb/mmBTU.  Compliance with this Emission Rate shall be determined by the $NO_x$ CEMS required by Subparagraph 21.b.

18

     ii.     $SO_2$:  $SO_2$ Emission Rate of no greater than 0.010 lb/mmBTU as an average of the three test runs required by stack testing conducted in accordance with Subparagraph 29.a using the Method specified in Subparagraph 29.b.ii of this Consent Decree.   By no later than January 31, 2016, Cleveland Thermal shall undertake the first stack test and shall continue to conduct stack testing on an annual basis thereafter in accordance with Paragraph 29 of this Consent Decree.

     iii.     PM:   PM Emission Rate of no greater than 0.010 lb/mmBTU as an avrage of the three test runs required by stack testing conducted in accordance with Subparagraph 29.a using the Method specified in Subparagraph 29.b.iii of this Consent Decree.   By no later than January 31, 2016, Cleveland Thermal shall undertake the first stack test and shall continue to conduct stack testing on an annual basis thereafter in accordance with Paragraph 29 of this Consent Decree.

    d.    <u>Use of Replacement Natural Gas Boiler When Only One Boiler in the System is In Operation</u>.   Commencing on January 1, 2016, and continuing until January 31, 2017, when only one Boiler in the System is in Operation, Cleveland Thermal shall Operate the Replacement Natural Gas Boiler as its first choice among Boilers in the System, except during Malfunctions of the Replacement Natural Gas Boiler, required annual maintenance of the Replacement Natural Gas Boiler, or External Natural Gas Supply Outages.

    **E.**    **New Natural Gas Boilers at the Hamilton Avenue Facility**

22.    In addition to the Replacement Natural Gas Boiler required in Paragraph 21, Cleveland Thermal shall install natural gas-fired boilers with a total capacity of no less than 364 mmBTU/hr at the Hamilton Avenue Facility.   Cleveland Thermal shall comply with all of the following Subparagraphs:

    a.    <u>Submission of PTI Application</u>.   By no later than May 31, 2016, Cleveland Thermal shall submit to Ohio EPA an application for a federally enforceable Permit-to-Install ("PTI") for new Natural Gas Boilers ("New Natural Gas Boilers") at the Hamilton Avenue Facility. In the application, Cleveland Thermal shall identify the New Natural Gas Boilers as "new sources"

19

and shall include all information that Ohio EPA requires to be submitted for new sources. Cleveland Thermal shall comply with Prevention of Significant Deterioration ("PSD") permitting requirements, if applicable, and Nonattainment New Source Review ("Nonattainment NSR") permitting requirements, if applicable.   If PSD permitting requirements and Nonattainment NSR permitting requirements are not applicable, Cleveland Thermal shall employ Best Available Technology as defined at Ohio Admin. Code § 3745-31-01(T) on the New Natural Gas Boilers. After submitting the application, Cleveland Thermal shall fully cooperate with Ohio EPA to secure the PTI by promptly submitting all information that Ohio EPA seeks following its receipt of the initial application materials.

b.      Copy to EPA.   On the same day that Cleveland Thermal submits its application to Ohio EPA pursuant to this Paragraph, Cleveland Thermal shall email to EPA at the addresses listed in Section XVI (Notices) of this Decree a copy of the application (including all attachments).

c.      Emission Limitations.   In no event shall Cleveland Thermal seek emissions limitations less stringent than, nor averaging times greater than, the following:

**TABLE 2**

| Pollutant | Emission Limitation | Averaging Time |
|-----------|---------------------|----------------|
| $SO_2$ | 0.010 lb/mmBTU. | 1-hour average |
| $NO_x$ | 0.100 lb/mmBTU | 30-Day Rolling Average |
| PM | 0.010 lb/mmBTU | 1-hour average |

Nothing in this Subparagraph or this Consent Decree shall preclude Ohio EPA from establishing and/or requiring compliance with more stringent $SO_2$, PM, and/or $NO_x$ Emission Rates and/or (a) shorter averaging period(s).

      d.      <u>Installation and Operation of the New Natural Gas Boilers</u>.   By no later than January 31, 2017, Cleveland Thermal shall complete installation and commence operation of the New Natural Gas Boilers.

      e.      <u>Installation, Calibration, Maintenance and Continuous Operation of NO$_x$ CEMS on New Natural Gas Boilers</u>.  By no later than January 31, 2017, Cleveland Thermal shall install, calibrate, maintain, and Continuously Operate a NO$_x$ CEMS on the New Natural Gas Boilers in accordance with the requirements of Paragraph 30 of this Consent Decree. Cleveland Thermal shall comply with all of the requirements of Paragraph 30 for this CEMS.

      f.      By the earlier of the date in the PTI or March 31, 2017, Cleveland Thermal shall demonstrate compliance with all of the emissions standards in the New Natural Gas Boilers' PTI and shall continuously maintain compliance with each of the PTI's terms and conditions.   Compliance shall be demonstrated through the following methods:

### TABLE 3

| Pollutant | Compliance Method |
|---|---|
| SO$_2$ | Performance test (40 C.F.R. Part 60, Appendix A, Method 6C). |
| NO$_x$ | NO$_x$ CEMs |
| PM | Performance test (40 C.F.R. Part 51, Appendix M, Method 202, and 40 C.F.R. Part 60, Appendix A, Method 5) |

The performance tests required in Table 3 may be satisfied by stack tests as may be required by a CAA permit from the State of Ohio for any year that such stack test is required under a CAA permit.

21

23. <u>Prioritization of Use of Natural Gas Boilers over Oil-Fired Boilers</u>. Commencing on January 31, 2017, and continuing until this condition is set forth in a federally enforceable permit, Cleveland Thermal shall operate natural gas-fired Boilers at the Hamilton Avenue Facility to their full capacity prior to the utilization of oil-fired Boilers 1, 2, or 3, except during Malfunctions of the Natural Gas Boilers, required annual maintenance of the Natural Gas Boilers, or External Natural Gas Supply Outages.

**F.  Optional New Natural Gas Cogeneration Facility**

24. <u>Cogeneration Option:  Installation and Operation of New Natural Gas-Fired Cogeneration Facility</u>. Cleveland Thermal may elect to install a New Natural Gas-Fired Cogeneration Facility.  If Cleveland Thermal makes this election, Cleveland Thermal shall comply with the requirements of this Paragraph.

a. <u>Submission of PTI Application</u>.  By no later than May 31, 2018, Cleveland Thermal shall submit to Ohio EPA an application for a federally enforceable Permit-to-Install ("PTI") for a new New Natural Gas-Fired Cogeneration Facility ("New NG Cogen Facility").  In the application, Cleveland Thermal shall identify each emission source within the New NG Cogen Facility as a "new source" and shall include all information that Ohio EPA requires to be submitted for new sources.  Cleveland Thermal shall comply with Prevention of Significant Deterioration ("PSD") permitting requirements, if applicable, and Nonattainment New Source Review ("Nonattainment NSR") permitting requirements, if applicable.  If PSD permitting requirements and Nonattainment NSR permitting requirements are not applicable, Cleveland Thermal shall employ Best Available Technology as defined at OAC § 3745-31-01(T) on each emission source. After submitting the application, Cleveland Thermal shall fully cooperate with Ohio EPA to

secure the PTI by promptly submitting all information that Ohio EPA seeks following its receipt of the initial application materials.

        b.    <u>Copy to EPA.</u>  On the same day that Cleveland Thermal submits its application to Ohio EPA pursuant to this Paragraph, Cleveland Thermal shall email to EPA at the addresses listed in Section XVI (Notices) of this Decree a copy of the application (including all attachments).

        c.    <u>$NO_x$ Emission Limitation.</u>  In no event shall Cleveland Thermal seek a $NO_x$ emissions limitation less stringent than 0.100 lb/mmBTU nor an averaging time greater on a 30-Day Rolling Average.

        d.    <u>Installation and Operation of the New NG Cogen Facility.</u>  By no later than December 31, 2020, Cleveland Thermal shall complete installation and commence operation of the New NG Cogen Facility.

        e.    <u>Installation, Calibration, Maintenance and Continuous Operation of $NO_x$ CEMS on Natural Gas Boilers with the New NG Cogen Facility.</u>  By no later than December 31, 2020, Cleveland Thermal shall install, calibrate, maintain, and Continuously Operate one or more (as needed) $NO_x$ CEMS on all new natural gas units at the New NG Cogen Facility in accordance with the requirements of Paragraph 30 of this Consent Decree.  Cleveland Thermal shall comply with all of the requirements of Paragraph 30 for this (these) CEMS.

        f.    <u>Compliance Demonstration and Continuous Compliance for the New NG Cogen Facility.</u>  By the earlier of the date in the PTI or February 28, 2021, Cleveland Thermal shall demonstrate compliance with all of the emissions standards in the New NG Cogen Facility's PTI and shall continuously maintain compliance with each of the PTI's terms and conditions.

    **G.**    <u>**System-Wide Tonnage Limitations**</u>

25.   <u>System-Wide Tonnage Limitations</u>.   Regardless of whether Cleveland Thermal elects to install a New NG Cogen Facility pursuant to Paragraph 24, Cleveland Thermal shall not exceed the following System Wide Tonnage Limitations for the following time periods:

**TABLE 4**

| | Time Period | $SO_2$ (TPY) | $NO_x$ (TPY) | PM (TPY) |
|---|---|---|---|---|
| 1 | Calendar Year 2016 | 640 | 300 | 96 |
| 2 | Calendar Year 2017 | 214 | 184 | 35 |
| 3 | From January 1, 2018, until either: (i) termination of the Consent Decree (if Cleveland Thermal does not elect to install a New NG Cogen Facility pursuant to Paragraph 24); or (ii) the commencement of the operation of the New NG Cogen Facility (if Cleveland Thermal elects to install a New NG Cogen Facility pursuant to Paragraph 24) | 161 | 159 | 27 |
| 4 | If Cleveland Thermal elects to install a New NG Cogen Facility pursuant to Paragraph 24, then, from the commencement of the operation of the New NG Cogen Facility until termination of this Consent Decree | 173 | 279 | 39 |

26.   For purposes of determining compliance with System-Wide $SO_2$ and PM Tonnage Limitations in Table 4, Cleveland Thermal shall use data from the most recent stack test, if any, and heat input determined through measurement of fuel consumption and heat content as measured on a frequency no less than monthly.

27.   For purposes of determining compliance with the System-Wide $NO_x$ Tonnage Limitations in Table 4, Cleveland Thermal shall use the $NO_x$ emissions data obtained from the $NO_x$ CEMS, when and where those CEMS have been installed.   Otherwise, Cleveland Thermal shall use $NO_x$ data from the most recent stack test.

28.   For purposes of determining compliance with the tons per year limitations for a year, if any, in which the New NG Cogen Facility operates for part of the year, the total tons per year of the respective pollutant shall equal:   (the percentage of days in the year without operation of the New NG Cogen Facility multiplied by the limitation in Row 3 of Table 4) plus (percentage

24

of days in the year with operation of the New NG Cogen Facility multiplied by the limitation in Row 4 of Table 4).

      **H.**    <u>**Stack Tests for NO$_X$, SO$_2$, and PM**</u>

    29.    Whenever a stack test is required by this Consent Decree, Cleveland Thermal shall conduct the stack test in accordance with this Paragraph.

    a.    <u>General</u>.  For each pollutant, each stack test shall consist of three separate operating runs performed under representative operating conditions.  "Representative" operating conditions shall not include periods of startup, shutdown or Malfunction.  For each pollutant, the sampling time for each run shall be at least 120 minutes and the sample volume of each run shall be at least 1.70 dry standard cubic meters (60 dry standard cubic feet).  The results of each stack test shall be submitted to EPA within 60 days of completion of each test.

    b.    <u>Methods and Procedures</u>.  Cleveland Thermal shall comply with the following methods and procedures or any alternate method and procedure approved by EPA pursuant to Section X (Review and Approval of Submittals) of this Consent Decree:

    i.    <u>For NO$_X$</u>:  40 C.F.R. Part 60, Appendix A; Methods 7, 7A, 7C, 7D, *or* 7E (any of the five listed methods are acceptable)

    ii.    <u>For SO$_2$</u>:  40 C.F.R. Part 60, Appendix A, Method 6C.

    iii.    <u>For PM</u>:  40 C.F.R. Part 51, Appendix M, Method 202, and 40 C.F.R. Part 60, Appendix A, Method 5.

## I.    CEMS

30.    For the NOx CEMS required by Paragraph 21.b of this Consent Decree, Cleveland Thermal shall comply with Subparagraphs 30.e–30.g of this Paragraph.   For each other NOx CEMS required by this Decree, Cleveland Thermal shall comply with all of the Subparagraphs of this Paragraph.

      a.    Monitor Requirements.

         i.    Each CEMS that is installed shall be appropriate for the anticipated stack conditions and capable of measuring $NO_x$ on an hourly average basis.

         ii.    Each CEMS shall consist of a continuous gas monitor measuring $NO_x$ concentration on an hourly basis and a diluent monitor to convert the concentration to units expressed in lb/mmBTU.

      b.    Submission of an Installation and Calibration Plan.   By no later than one year prior to the date on which the CEMS must commence operation, Cleveland Thermal shall submit to EPA for review and approval pursuant to Section X (Review and Approval of Submittals) a plan for the installation and calibration of the CEMS ("Installation and Calibration Plan"). After approval, Cleveland Thermal shall comply with the Installation and Calibration Plan.

      c.    Submission of a Quality Assurance/Quality Control Protocol.   By no later than six months prior to the date on which the CEMS must commence operation, Cleveland Thermal shall submit to EPA for review and approval pursuant to Section X (Review and Approval of Submittals) a proposed Quality Assurance/Quality Control protocol ("QA/QC Protocol") for the CEMS.   After approval, Cleveland Thermal shall comply with the QA/QC Protocol.

        d.      <u>Criteria to be Used</u>.   In developing both the Installation and Calibration Plan and the QA/QC Protocol, Cleveland Thermal shall use the criteria set forth in 40 C.F.R. Part 60, Appendix B, Performance Specification 2, and Appendix F, Procedure 1.

        e.      <u>Installation, Calibration, Maintenance, and Operation of CEMS</u>.   By no later than the date on which the CEMS must commence operation, except for periods specifically identified in the Installation and Calibration Plan and/or the QA/QC Protocol involving monitor Malfunction, maintenance, repair, calibration, or testing, Cleveland Thermal shall:   (i) install, calibrate, maintain and Continuously Operate the CEMS when the Boiler it serves is operating; (ii) conduct performance specification tests on the CEMS; and (iii) demonstrate compliance with the Installation and Calibration Plan and the QA/QC Protocol approved by EPA.

        f.      <u>Reporting</u>.   Pursuant to Section IX (Periodic Reporting), Cleveland Thermal shall report to EPA the data recorded by the CEMS during Boiler Operation, expressed as lb/mmBTU, in electronic format.   The report shall include the 30-Day Rolling Average Emission Rates and any $NO_x$ emission rates in excess of the applicable emission rate.

        g.      <u>Recordkeeping</u>.   Cleveland Thermal shall maintain, in an electronic database that is capable of maintaining this data for five years, the hourly average emissions values of $NO_x$ in lb/mmBTU.

27

## V.  PROHIBITION ON THE USE OF CONSENT DECREE EMISSION REDUCTIONS

31.     "CD Emission Reductions" shall mean any emissions reductions that result from the interim compliance measures at the Canal Road Facility required by Subsection IV.A, the Retirement of Boilers 101 and 104, and the Project(s) required by Section VI (Environmental Mitigation Projects) of this Consent Decree.

32.     Prohibition on the Use of CD Emission Reductions and Requirements related to Baseline Adjustments.   Cleveland Thermal shall neither generate nor use any CD Emissions Reductions:   (i) as netting reductions (for example, as creditable, contemporaneous emissions decreases under 40 C.F.R. § 52.21(b)(3)(2013)); (ii) as emissions offsets; or (iii) to apply for, obtain, trade, or sell any emission reduction credits.   In any permit application that relates to the Canal Road and/or Hamilton Avenue Facilities, baseline actual emissions for each unit at the Facilities during any 24-month period selected by Cleveland Thermal shall be adjusted downward to exclude any portion of the baseline emissions that would have been eliminated as CD Emissions Reductions had Cleveland Thermal been complying with this Consent Decree during that 24-month period.

33.     Outside the Scope of the Prohibition.   Nothing in this Consent Decree is intended to preclude the use of CD Emissions Reductions from being considered by EPA or Ohio EPA as creditable contemporaneous emission decreases for the purposes of attainment demonstrations submitted pursuant to Section 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on National Ambient Air Quality Standards, PSD increment, or air quality related values, including visibility, in a Class I area.

## VI.  **ENVIRONMENTAL MITIGATION PROJECTS**

34.     Cleveland Thermal shall implement one or more environmental mitigation projects ("Projects") as described in Appendix A to this Consent Decree in compliance with the plans and schedules for such Projects and other terms of this Consent Decree.    In implementing the Project(s), Cleveland Thermal shall spend no less than $350,000 in Project Dollars. Cleveland Thermal shall not include its own personnel costs in overseeing the implementation of the Projects as Project Dollars.

35.     The Project(s) to be performed pursuant to this Section shall be for the purpose of beneficially restoring and/or mitigating the environments that EPA alleges were damaged by the operation of Boilers 101 and 104.

36.     Cleveland Thermal shall maintain, and present to EPA upon request, all documents to substantiate the Project Dollars expended to implement the Projects described in Appendix A, and shall provide these documents to EPA within 30 days of a request for the documents.

37.     All plans and reports prepared by Cleveland Thermal pursuant to the requirements of this Section VI (Environmental Mitigation Projects) and required to be submitted to EPA shall be publicly available.   Cleveland Thermal shall certify, as part of each plan submitted to EPA for any Project, that Cleveland Thermal is not otherwise required by law to perform the Project described in the plan, that Cleveland Thermal is unaware of any other person who is required by law to perform the Project, and that Cleveland Thermal will not use any Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law, including but not limited to any applicable renewable energy or energy efficiency portfolio standards.

38.     Cleveland Thermal shall use good faith efforts to secure as much environmental benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Consent Decree.

39.     If Cleveland Thermal elects (where such an election is allowed) to undertake a Project by contributing funds to another person or entity that will carry out the Project in lieu of Cleveland Thermal, but not including Cleveland Thermal's agents or contractors, that person or instrumentality must, in writing:    (a) identify its legal authority for accepting such funding; and (b) identify its legal authority to conduct the Project for which Cleveland Thermal contributes the funds.    Regardless of whether Cleveland Thermal elects (where such election is allowed) to undertake a Project by itself or to do so by contributing funds to another person or instrumentality that will carry out the Project, Cleveland Thermal acknowledges that it will receive credit for the expenditure of such funds as Project Dollars only if Cleveland Thermal demonstrates that the funds have been actually spent by either Cleveland Thermal or by the person or instrumentality receiving them, and that such expenditures met all requirements of this Consent Decree.

40.     Cleveland Thermal shall comply with the reporting requirements described in Appendix A.

41.     Within 90 days following the completion of each Project required under this Consent Decree (including any applicable periods of demonstration or testing), Cleveland Thermal shall submit to the United States a report that documents the date that the Project was completed, the results from implementing the Project, including the emission reductions or other environmental benefits achieved, and the Project Dollars expended by Cleveland Thermal in implementing the Project.

## VII.   CIVIL PENALTY

42.     By no later than 30 Days after the Date of Entry of this Consent Decree, Cleveland Thermal shall pay to the United States a civil penalty in the amount of $75,000.   The civil penalty shall be paid by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing USAO File Number 2012V02258 and DOJ Case Number 90-5-2-1-10579 and the civil action case name and case number assigned to the United States' enforcement action in this case.   The costs of such EFT shall be Cleveland Thermal's responsibility.   Payment shall be made in accordance with instructions provided to Cleveland Thermal by the Financial Litigation Unit of the U.S. Attorney's Office for the Northern District of Ohio.   Any funds received after 2:00 p.m. EDT shall be credited on the next business day.   At the time of payment, Cleveland Thermal shall provide notice of payment, referencing USAO File Number 2012V02258, DOJ Case Number 90-5-2-1-10579, and the civil action case name and case number, to the Department of Justice and to EPA in accordance with Section XVI (Notices).

43.     Failure to timely pay the civil penalty shall subject Cleveland Thermal to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Cleveland Thermal liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

44.     Payments made pursuant to this Section are penalties within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and are not tax-deductible expenditures for purposes of federal law.

## VIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

45.     This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the Date of Lodging and in the following Notices and Findings of Violation:   EPA 5 11 OH 02 (October 28, 2010) and EPA 5 11 OH 11 (June 29, 2011).   Copies of these Notices and Findings of Violation are attached as Appendix B to this Consent Decree.

46.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 45.   This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 45.   The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Cleveland Thermal's Facility, whether related to the violations addressed in this Consent Decree or otherwise.

47.      In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, other appropriate relief relating to the Facility or Cleveland Thermal's violations, Cleveland Thermal shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to

Paragraph 45.   Except as stated in this Paragraph 47, Cleveland Thermal reserves all other rights, claims and defenses in any such action by the United States.

48.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.   Cleveland Thermal is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Cleveland Thermal's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.   Applicable laws and regulations include, but are not limited to, the Clean Water Act National Pollutant Discharge Elimination System ("NPDES") implementing regulations, Ambient Air Quality Standards, and the National Emission Standards for Hazardous Air Pollutants for Industrial/Commercial/Institutional Boilers and Process Heaters ("Boiler MACT").   Nothing in this settlement proposal should be construed to provide any relief from the emission limits or deadlines for the installation of pollution controls specified in these regulations.   The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Cleveland Thermal's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, 42 U.S.C. § 7413(b), *et seq*., or with any other provisions of federal, State, or local laws, regulations, or permits.

49.     This Consent Decree does not limit or affect the rights of Cleveland Thermal or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Cleveland Thermal, except as otherwise provided by law.

50.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## IX.   PERIODIC REPORTING

51.     After entry of this Consent Decree, Cleveland Thermal shall submit to the United States a periodic report within 30 days after the end of each calendar quarter (January through March; April through June; July through September; and October through December).   The report shall include the following information:

a.      All information necessary to determine compliance with each of the requirements of Section IV (Compliance Requirements) and Section V (Prohibition On The Use Of Consent Decree Emission Reductions);

b.      A description of any problems anticipated with respect to meeting the requirements of Section IV (Compliance Requirements); and

c.      A summary of actions implemented and expenditures (cumulative and in the current reporting period) made in the course of the implementation of the Projects required in Section VI (Environmental Mitigation Projects).

52.     In any periodic report submitted pursuant to this Section IX, Cleveland Thermal may incorporate by reference information previously submitted under its Title V permitting requirements, provided that Cleveland Thermal attaches the Title V Permit report (or the pertinent portions of such report) and provides a specific reference to the provisions of the Title V Permit report that are responsive to the information required in the periodic report.

53.     In addition to the reports required pursuant to this Section IX, if Cleveland Thermal violates or deviates from any provision of this Consent Decree, Cleveland Thermal shall submit to the United States a report on the violation or deviation within 15 business days after Cleveland Thermal knew or by the exercise of due diligence should have known of the event. In the report, Cleveland Thermal shall explain the cause or causes of the violation or deviation and any measures taken or to be taken by Cleveland Thermal to cure the reported violation or deviation or to prevent such violation or deviation in the future.   If at any time, the provisions of

34

this Consent Decree are included in Title V Permits, then the deviation reports required under applicable Title V regulations shall be deemed to satisfy all the requirements of this Paragraph.

54.     Each Cleveland Thermal report shall be signed by the Responsible Official as defined in Title V of the Act, and shall contain the following certification:

> *This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.   Based on my evaluation, or the direction and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete.   I understand that there are significant penalties for submitting false, inaccurate, or misleading information to the United States.*

55.     The reporting requirements of this Consent Decree do not relieve Cleveland Thermal of any reporting obligations required by the CAA or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

56.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## X.   REVIEW AND APPROVAL OF SUBMITTALS

57.     <u>Approval of Deliverables</u>.   After review of any plan, report, or other item that is required to be submitted to EPA for review and approval pursuant to this Consent Decree, EPA shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

58.     If the submission is approved pursuant to Paragraph 57, Cleveland Thermal shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.   If the submission is

conditionally approved or approved only in part pursuant to Subparagraph 57(b) or (c), Cleveland

Thermal shall, upon written direction from EPA, take all actions required by the approved plan,

report, or other item that EPA determines are technically severable from any disapproved portions,

subject to Cleveland Thermal's right to dispute only the specified conditions or the disapproved

portions, under Section XIII (Dispute Resolution).

59.     If the submission is disapproved in whole or in part pursuant to

Subparagraphs 57(c) or (d), Cleveland Thermal shall, within 45 Days or such other time as the

Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or

disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.   If the

resubmission is approved in whole or in part, Cleveland Thermal shall proceed in accordance with

the preceding Paragraph.

60.     Any stipulated penalties applicable to the original submission, as provided in

Section XI (Stipulated Penalties), shall accrue during the 45-day period or other specified period,

but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part;

provided that, if the original submission was so deficient as to constitute a material breach of

Cleveland Thermal's obligations under this Decree, the stipulated penalties applicable to the

original submission shall be due and payable notwithstanding any subsequent resubmission.

61.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in

whole or in part, EPA may again require Cleveland Thermal to correct any deficiencies, in

accordance with the preceding Paragraphs, subject to Cleveland Thermal's right to invoke Dispute

Resolution and the right of EPA to seek stipulated penalties as provided in the preceding

Paragraphs.

62.     Cleveland Thermal shall comply with the requirements regarding submission of reports related to the Environmental Mitigation Projects undertaken by Cleveland Thermal set forth in Appendix A.

## XI.   STIPULATED PENALTIES

63.     Cleveland Thermal shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified in the Table below.   Nothing in this Paragraph shall prevent Cleveland Thermal from asserting force majeure pursuant to Section XII (Force Majeure) as a defense to a demand for stipulated penalties.

### Stipulated Penalty Table

| Consent Decree Violation | Stipulated Penalty |
| --- | --- |
| **a.**     Violation of Subparagraph 9.a.:   Failure to use best efforts to purchase and use the lowest sulfur coal available from local markets in accordance with the requirements of Subparagraph 9.a. | $3,500 per Day |
| **b.**     Violation of Subparagraph 9.b.:   Failure to continuously comply with the permitted $SO_2$ emission limit of 1.380 lbs/mmBTU based on monthly composite coal sampling and analysis in accordance with the requirements of Subparagraph 9.b. | Days 1–30:   $2,000 per Day per Boiler<br><br>Days 31 and later:   $5,000 per Day per Boiler |
| **c.**     Violation of Paragraph 10:    Failure to Continuously Operate the Multiclone in accordance with the requirements of Paragraph 10 | $5,000 per Day |
| **d.**     Violation of Paragraph 11:    Failure to comply with each Emission Control or Limitation in accordance with the requirements of Subparagraph 11.a, 11.b, or 11.c. (A violation of one Subparagraph is a separate violation from a violation of a different Subparagraph.) | Days 1–30: $2,000 per Day per violation per Boiler<br><br>Days 31 and later: $5,000 per Day per violation per Boiler |

| | |
|---|---|
| **e.** <u>Violation of Paragraph 12</u>:   By the deadlines in Paragraph 12, failure to permanently cease Operating Boiler 102 or failure to Render Boiler 102 Physically Incapable of Combusting Any Fuel or failure to Retire Boiler 102 | For Operating Boiler 102 beyond the deadline for ceasing Operation: $37,500 per Day.<br><br>For failing to Render Boiler 102 Physically Incapable of Combusting Any Fuel or for failing to Retire Boiler 102 by the deadlines:<br><br>Days 1–30:               $250<br>Days 31–60:             $500<br>Days 61 and later:     $2,500 |
| **f.** <u>Violation of Paragraph 13</u>:   By the deadlines in Paragraph 13, failure to permanently cease Operating Boiler 5 or failure to Render Boiler 5 Physically Incapable of Combusting Any Fuel or failure to Retire Boiler 5 | For Operating Boiler 5 beyond the deadline for ceasing Operation: $37,500 per Day.<br><br>For failing to Render Boiler 5 Physically Incapable of Combusting Any Fuel or for failing to Retire Boiler 5 by the deadlines:<br><br>Days 1–30:               $250<br>Days 31–60:             $500<br>Days 61 and later:     $2,500 |
| **g.** <u>Violation of Paragraph 14</u>:   By the deadlines in Paragraph 14, failure to permanently cease Operating Boiler 6 or failure to Render Boiler 6 Physically Incapable of Combusting Any Fuel or failure to Retire Boiler 6 | For Operating Boiler 6 beyond the deadline for ceasing Operation: $37,500 per Day.<br><br>For failing to Render Boiler 6 Physically Incapable of Combusting Any Fuel or for failing to Retire Boiler 6 by the deadlines:<br><br>Days 1–30:               $250<br>Days 31–60:             $500<br>Days 61 and later:     $2,500 |
| **h.** <u>Violation of Paragraph 15</u>:   By the deadlines in Paragraph 15, failure to permanently cease Operating Boilers 101 or 104 or failure to Render Boilers 101 or 104 Physically Incapable of Combusting Any Fuel or failure to Retire Boilers 101 or 104 | For Operating Boiler 101 or 104 beyond the deadline for ceasing Operation:    $37,500 per Day per Boiler<br><br>For failing to Render Boiler 101 or 104 Physically Incapable of Combusting Any Fuel or for failing to Retire Boiler 101 or 104 by the |

| | |
|---|---|
| | deadlines (per Boiler):<br><br>Days 1–30:              $250<br>Days 31–60:          $500<br>Days 61 and later:     $2,500 |
| **i.**       Violation of Paragraph 16:    Failure to make each written request to Ohio EPA to revoke each authorization to Operate in accordance with the requirements of Paragraph 16 | Days 1–30:    $500 per Day per Boiler<br><br>Days 31 and later:    $1000 per Day per Boiler |
| **j.**       Violation of Paragraph 17:    Failure to provide each required notice to EPA in accordance with the requirements of Paragraph 17 | $250 per Day per Boiler |
| **k.**       Violation of Paragraph 18:    Failure to comply with each of the emission limitations and compliance demonstration methods for Boilers 1, 2, and 3 in accordance with the requirements of Subparagraphs 18.a and 18.b.    (A violation of one Subparagraph is a separate violation from a violation of a different Subparagraph.) | Days 1–30: $5,000 per Day per violation per Boiler<br><br>Days 31 and later: $10,000 per Day per violation per Boiler |
| **l.**       Violation of Paragraph 19:    Commencing no later than January 31, 2017, failure to operate or maintain Boilers 1, 2, and 3 at the Hamilton Avenue Facility as Limited-Use Boilers. | $10,000 per Day per Boiler |
| **m.**       Violation of Paragraph 20:    By the deadlines in Paragraph 20, failure to permanently cease Operating the Selected Oil-Fired Boiler or failure to Render the Selected Oil-Fired Boiler Physically Incapable of Combusting Any Fuel or failure to Retire the Selected Oil-Fired Boiler | For Operating the Selected Oil-Fired Boiler beyond the deadline for ceasing Operation: $37,500 per Day.<br><br>For failing to Render the Selected Oil-Fired Boiler Physically Incapable of Combusting Any Fuel or for failing to Retire the Selected Oil-Fired Boiler by the deadlines:<br><br>Days 1–30:              $250<br>Days 31–60:          $500<br>Days 61 and later:     $2,500 |
| **n.**       Violation of Paragraph 21.a.:    By no later than November 30, 2015, failure to install or commence operation of a Replacement Natural Gas Boiler in accordance with the requirements of Subparagraph 21.a. | Days 1–30:           $2,000<br>Days 31–60:        $5,000<br>Days 61 and later:    $10,000 |
| **o.**       Violation of Paragraph 21.b.:    By no later than December 31, 2015, failure to install, calibrate, maintain, or Continuously Operate a $NO_x$ CEMS on the Replacement Natural Gas Boiler in accordance with the requirements of Subparagraph 21.b. | Days 1–30:           $1,000<br>Days 31–60:        $2,000<br>Days 61 and later:     $5,000 |

| | |
|---|---|
| **p.**     <u>Violation of Paragraph 21.c.:</u>   Failure to demonstrate or thereafter maintain continuous compliance with each Emission Rate at the Replacement Natural Gas Boiler, in accordance with each subparagraph of Subparagraph 21.c (*i.e.*, i–iii). (A violation of any one Subparagraph (*i.e.*, 21.c.i, 21.c.ii, or 21.c.iii) is a separate violation from a violation of a different Subparagraph.) | Days 1–30: $5,000 per Day per violation during the first 30 Days<br><br>Days 31 and later: $10,000 per Day per violation |
| **q.**     <u>Violation of Paragraph 21.d.:</u>   When only one Boiler in the System is in Operation, failure to Operate the Replacement Natural Gas Boiler as the first choice among Boilers in the System, except during Malfunctions of the Replacement Natural Gas Boiler, required annual maintenance of the Replacement Natural Gas Boiler, or External Natural Gas Supply Outages, as set forth in Paragraph 21.d. | Days 1–30:          $2,000<br>Days 31–60:        $5,000<br>Days 61 and later:   $10,000 |
| **r.**     <u>Violation of Subparagraph 22.a.:</u>   Failure to submit a PTI application for the installation of New Natural Gas Boilers at the Hamilton Avenue Facility by May 31, 2016, in accordance with the requirements of Subparagraph 22.a. | <u>Penalty per Day from the date of the initial application to the corrected application:</u><br><br>Days 1–30:          $1,000<br>Days 31–60:        $2,000<br>Days 61 and later:    $5,000 |
| **s.**     <u>Violation of Subparagraph 22.b.:</u>   Failure to submit copies to EPA in accordance with the requirements of Subparagraph 22.b. | $250 per day |
| **t.**     <u>Violation of Subparagraph 22.c.:</u>   Failure to include each of the emissions limitations in the PTI application in accordance with the requirements of Subparagraph 22.c. | <u>Penalty per Day from the date of the initial application to the corrected application:</u><br><br>Days 1–30:          $1,000<br>Days 31–60:        $2,000<br>Days 61 and later:    $5,000 |
| **u.**     <u>Violation of Subparagraph 22.d.:</u>   By no later than January 31, 2017, failure to complete installation or commence operation of the New Natural Gas Boilers in accordance with the requirements of Subparagraph 22.d. | Days 1–30:          $4,000<br>Days 31–60:      $10,000<br>Days 61 and later:   $20,000 |
| **v.**     <u>Violation of Subparagraph 22.e.:</u>   By no later than January 31, 2017, failure to install, calibrate, maintain, or Continuously Operate a $NO_x$ CEMS on the New Natural Gas Boilers in accordance with the requirements of Paragraph 30 of this Consent Decree | Days 1–30:          $1,000<br>Days 31–60:        $2,000<br>Days 61 and later:   $5,000 |
| **w.**     <u>Violation of Subparagraph 22.f.:</u>   By the deadline in Paragraph 22.f, failure to demonstrate compliance with each of the emissions standards in the New Natural Gas Boilers' PTI or Table 3 or failure to continuously maintain compliance with each of the terms and conditions in the | Days 1–30: $5,000 per Day per violation<br><br>Days 31 and later: $10,000 per Day per violation |

| | |
|---|---|
| PTI. | |
| **x.** <u>Violation of Paragraph 23</u>:  Failure to operate natural gas-fired Boilers at the Hamilton Avenue Facility to their full capacity prior to the utilization of oil-fired Boilers 1, 2, or 3, except during Malfunctions of the Natural Gas Boilers, required annual maintenance of the Natural Gas Boilers, or External Natural Gas Supply Outages as set forth in Paragraph 23. | Days 1–30:               $2,000<br>Days 31–60:             $5,000<br>Days 61 and later:    $10,000 |
| **If Cleveland Thermal chooses to install and operate a New Natural Gas Cogeneration Facility as permitted by Paragraph 24, stipulated penalties in Subparagraph 63.y – 63.dd shall apply.    If Cleveland Thermal elects not to, then these Subparagraphs shall not apply.** | |
| **y.** <u>Violation of Subparagraph 24.a</u>:  Failure to submit a PTI application for the installation of a New NG Cogen Facility by May 31, 2018, in accordance with the requirements of Subparagraph 24.a. | <u>Period of time from</u> Penalty per day<br><u>the initial application to the</u><br><u>corrected application:</u><br><br>Days 1–30:               $1,000<br>Days 31–60:             $2,000<br>Days 61 and later:     $5,000 |
| **z.** <u>Violation of Subparagraph 24.b.</u>:    Failure to submit copies to EPA as set forth in Subparagraph 24.b. | $250 per Day |
| **aa.** <u>Violation of Subparagraph 24.c.</u>:    Failure to include the NOx emissions limitations in the PTI application in accordance with the requirements of Subparagraph 24.c. | <u>Penalty per day from the date of</u><br><u>the initial application</u><br><u>to the corrected application</u><br><br>Days 1–30:               $1,000<br>Days 31–60:             $2,000<br>Days 61 and later:     $5,000 |
| **bb.** <u>Violation of Subparagraph 24.d.</u>:    By no later than December 31, 2020, failure to complete installation or commence operation of the New NG Cogen Facility in accordance with the requirements of Subparagraph 24.d. | Days 1–30:               $2,000<br>Days 31–60:             $5,000<br>Days 61 and later:    $10,000 |
| **cc.** <u>Violation of Subparagraph 24.e.</u>:    By no later than December 31, 2020, failure to install, calibrate, maintain, or Continuously Operate a NOx CEMS on the New Natural Gas Boilers in accordance with the requirements of Paragraph 30 of this Consent Decree | Days 1–30:               $1,000<br>Days 31–60:             $2,000<br>Days 61 and later:     $5,000 |
| **dd.** <u>Violation of Subparagraph 24.f.</u>:    By the deadline in Paragraph 24.f, failure to demonstrate compliance with each of the emissions standards in the New NG Cogen Facility's PTI, or failure to continuously maintain compliance with each of the terms and conditions in the PTI. | Days 1–30:               $1,000<br>Days 31–60:             $2,000<br>Days 61 and later:     $5,000 |
| **ee.** <u>Violation of Paragraph 25</u>:  Failure to comply with each of the System-Wide Tonnage Limitations set forth in Table 4 of Paragraph 25 | For $SO_2$:<br>• $5,000 per ton for the first 100 tons;<br>• $10,000 per ton for each |

| | |
|---|---|
| | additional ton between: (i) 101 tons above the applicable annual limitation; and (ii) two times the applicable annual limitation; and<br>• $12,500 per ton for each ton above two times the applicable annual limitation<br><br>For $NO_x$:<br>• $5,000 per ton for the first 100 tons;<br>• $10,000 per ton for each additional ton between: (i) 101 tons above the applicable annual limitation; and (ii) two times the applicable annual limitation; and<br>• $12,500 per ton for each ton above two times the applicable annual limitation<br><br>For PM:<br>• $10,000 per ton for the first 10 tons over the limit; and<br>• $25,000 per ton for each additional ton over the limit. |
| **ff.**    Violation of Paragraph 29.   Failure to comply with either the general requirements of Subparagraph 29.a or the methods required by Subparagraph 29.b. | $2,500 per Day per violation |
| **gg.**    Violation of Subparagraph 30.a:   Failure to install A CEMS monitor that meets the conditions required by Subparagraph 30.a. | $1,000 per Day per violation |
| **hh.**    Violation of Subparagraph 30.b:   Failure to develop, submit, or comply with a CEMS Installation and Calibration Plan in accordance with the requirements of Subparagraphs 30.b and 30.d. | $1,000 per Day per violation |
| **ii.**    Violation of Subparagraph 30.c:   Failure to develop, submit, and comply with a CEMS QA/QC Plan in accordance with the requirements of Subparagraphs 30.c and 30.d. | $1,000 per Day per violation |
| **jj.**    Violation of Subparagraph 30.e:   Failure to comply with the requirements for CEMS installation, calibration, maintenance and operation in accordance with the requirements of Subparagraph 30.e. | $1,000 per Day per violation |
| **kk.**    Violation of Subparagraph 30.f:   Failure to submit reports in accordance with the requirements of Subparagraph 30.f. | $1,000 per Day per violation |

| ll.    Violation of Subparagraph 30.g:   Failure to retain records in accordance with the requirements of Subparagraph 30.g. | $1,000 per Day per violation |
|---|---|
| mm.    Section VI: Failure to undertake and complete as described in Appendix A any of the Environmental Mitigation Projects in accordance with the requirements of Section VI | Days 1-30: $1,000 per Day per violation<br>Days 31 and later: $5,000 per Day per violation |
| nn.    Section VII: Failure to pay the civil penalty as set forth in Section VII | $1,000 per Day |

64.     All stipulated penalties shall begin to accrue on the Day after the performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases, whichever is applicable. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

65.     Cleveland Thermal shall pay all stipulated penalties to the United States within 30 Days of receipt of written demand to Cleveland Thermal from the United States, and shall continue to make such payments every 30 Days thereafter until the violation(s) no longer continues, unless Cleveland Thermal elects within 20 Days of receipt of written demand to Cleveland Thermal from the United States to dispute the accrual of stipulated penalties in accordance with the provisions in Section XIII (Dispute Resolution) of this Consent Decree.

66.     Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 64 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.      If the dispute is resolved by agreement, or by a decision of the United States pursuant to Section XIII (Dispute Resolution) of this Consent Decree that is not appealed to the

Court, accrued stipulated penalties agreed or determined to be owing, together with accrued

interest, shall be paid within 30 Days of the effective date of the agreement or of the receipt of the

United States' decision;

        b.     If the dispute is appealed to the Court and the United States prevails in

whole or in part, Cleveland Thermal shall, within 30 Days of receipt of the Court's decision or

order, pay all accrued stipulated penalties determined by the Court to be owing, together with

interest accrued on such penalties determined by the Court to be owing, except as provided in

Subparagraph c, below;

        c.     If the Court's decision is appealed by either Party, Cleveland Thermal shall,

within 15 Days of receipt of the final appellate court decision, pay all accrued stipulated penalties

determined to be owing, together with interest accrued on such stipulated penalties determined to

be owing by the appellate court.

67.     If Cleveland Thermal fails to pay stipulated penalties in compliance with the terms

of this Consent Decree, the United States shall be entitled to collect interest on such penalties, as

provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.   Nothing in this

Paragraph shall be construed to limit the United States from seeking any remedy otherwise

provided by law for Cleveland Thermal's failure to pay any stipulated penalties.

68.     The stipulated penalties provided for in this Consent Decree shall be in addition to

any other rights, remedies, or sanctions available to the United States by reason of Cleveland

Thermal's failure to comply with any requirement of this Consent Decree or applicable law, except

that for any violation of the Act for which this Consent Decree provides for payment of a stipulated

penalty, Cleveland Thermal shall be allowed a credit for stipulated penalties paid against any

statutory penalties also imposed for such violation.   In addition to injunctive relief or stipulated

penalties, the United States may seek mitigating emissions reductions equal to or greater than the excess amounts if the violations result in excess emissions.   Cleveland Thermal reserves the right to oppose the United States' request for mitigating emission reductions.

69.     Upon the Effective Date of this Consent Decree, the stipulated penalty provisions of this Decree shall be retroactively enforceable with regard to any and all violations of Section IV (Compliance Requirements) that have occurred prior to the Effective Date of the Consent Decree, provided that stipulated penalties that may have accrued prior to the Effective Date may not be collected unless and until this Consent Decree is entered by the Court.   If the United States sends a demand for stipulated penalties prior to the Effective Date of the Consent Decree, the Parties shall meet and confer regarding the demand.   Interest shall not accrue on any stipulated penalties that are demanded for violations that occur prior to the Effective Date of this Consent Decree for the period of time between the demand and the Effective Date.

70.     Cleveland Thermal shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 42, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

71.     The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

## XII.  FORCE MAJEURE

72.     For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of Cleveland Thermal, their contractors, or any entity controlled by Cleveland Thermal that delays or prevents compliance with any provision of this Consent Decree or otherwise causes noncompliance with any provision

of this Consent Decree despite Cleveland Thermal's best efforts to fulfill the obligation.   "Best efforts to fulfill the obligation" include using the best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is occurring, and (b) after it has occurred, such that the delay or noncompliance, and any adverse environmental effects of the delay or noncompliance, is minimized to the greatest extent possible.   Force Majeure does not include Cleveland Thermal's financial inability to perform any obligation of the Consent Decree.

73.   <u>Notice of Force Majeure Events</u>.   If any event occurs or has occurred that may delay or prevent compliance with or otherwise cause noncompliance with any obligation under this Consent Decree, as to which Cleveland Thermal intends to assert a claim of Force Majeure, Cleveland Thermal shall provide notice orally or by electronic or facsimile transmission to EPA within five days of when Cleveland Thermal first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or noncompliance.   Within seven days thereafter, Cleveland Thermal shall provide in writing to EPA notice under this Paragraph of the Consent Decree and describe the anticipated length of time that the delay or noncompliance may persist, the cause or causes of the delay or noncompliance, all measures taken or to be taken by Cleveland Thermal to prevent or minimize the delay or noncompliance and any adverse environmental effect of the delay or noncompliance, the schedule by which Cleveland Thermal proposes to implement those measures, and Cleveland Thermal's rationale for attributing a delay or noncompliance to a Force Majeure Event.   Cleveland Thermal shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure event.   Cleveland Thermal shall be deemed to know of any circumstance which Cleveland Thermal, its contractors, or any entity controlled by Cleveland Thermal knew or should have known.   Failure to comply with the above requirements shall preclude Cleveland Thermal from

asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.

74.     If EPA agrees that the delay or anticipated delay is attributable to a Force Majeure Event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure Event will be extended by EPA, for such time as is necessary to complete those obligations.   An extension of the time for performance of the obligations affected by the Force Majeure Event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Cleveland Thermal in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure Event.

75.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure Event, EPA will notify Cleveland Thermal in writing of its decision.

76.     If Cleveland Thermal elects to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution), it shall do so no later than 30 Days after receipt of EPA's notice. In any such proceeding, Cleveland Thermal shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure Event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Cleveland Thermal complied with the requirements of Paragraph 73. If Cleveland Thermal carries this burden, the delay at issue shall be deemed not to be a violation by Cleveland Thermal of the affected obligation of this Consent Decree identified to EPA and the Court.

## XIII.   DISPUTE RESOLUTION

77.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.   Cleveland Thermal's failure to seek resolution of a dispute under this Section shall preclude Cleveland Thermal from raising any such issue as a defense to an action by the United States to enforce any obligation of Cleveland Thermal arising under this Decree.

78.     Informal Dispute Resolution.   Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.   The dispute shall be considered to have arisen when Cleveland Thermal sends the United States a written Notice of Dispute.   Such Notice of Dispute shall state clearly the matter in dispute.   The period of informal negotiations shall not exceed 45 days from the date the dispute arises, unless that period is modified by written agreement.   If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 30 days after the conclusion of the informal negotiation period, Cleveland Thermal invokes formal dispute resolution procedures as set forth below.

79.     Formal Dispute Resolution.   Cleveland Thermal shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.   The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Cleveland Thermal's position and any supporting documentation relied upon by Cleveland Thermal.

80.     The United States shall serve its Statement of Position within 45 days of receipt of Cleveland Thermal's Statement of Position.   The United States' Statement of Position shall

48

include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.   The United States' Statement of Position shall be binding on Cleveland Thermal, unless Cleveland Thermal files a motion for judicial review of the dispute in accordance with the following Paragraph.

81.     Cleveland Thermal may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XVI (Notices) of this Consent Decree, a motion requesting judicial resolution of the dispute.   The motion must be filed within 30 days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph.   The motion shall contain a written statement of Cleveland Thermal's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

82.     The United States shall respond to Cleveland Thermal's motion within the time period allowed by the Local Rules of this Court.   Cleveland Thermal may file a reply memorandum, to the extent permitted by the Local Rules.

83.     <u>Standard of Review</u>.   In any dispute brought under this Section, Cleveland Thermal shall bear the burden of demonstrating that its position complies with this Consent Decree and that it is entitled to relief under applicable principles of law.

## XIV.  **PERMITS**

84.     Cleveland Thermal shall be responsible for securing all permits necessary to comply with this Consent Decree.   In any instance where otherwise applicable law or this Consent Decree requires Cleveland Thermal to secure a permit to authorize construction or operation of

any device, including all preconstruction, construction, and operating permits required under applicable state law, Cleveland Thermal shall make such application in a timely manner.

85.　Where any compliance obligation under this Section requires Cleveland Thermal to obtain a federal, state, or local permit or approval, Cleveland Thermal shall submit timely and approvable applications and take all other actions necessary to obtain all such permits or approvals.　Any failure by Cleveland Thermal to submit a timely permit application for a Facility or to timely submit any additional information requested by the permitting authority shall bar any use by Cleveland Thermal of Section XII (Force Majeure), where a Force Majeure claim is based on permitting delays.　If Cleveland Thermal has submitted a timely and approvable permit application and has timely submitted all additional information requested by the permitting authority, and the permitting authority does not issue a permit or a permit modification or otherwise take an action on the application in a timely manner, Cleveland Thermal may seek relief under Section XII (Force Majeure).

86.　Notwithstanding the reference to Title V permits in this Consent Decree, the enforcement of such permits shall be in accordance with their own terms and the Act and its implementing regulations.　The Title V permits shall not be enforceable under this Consent Decree, although any term or limit established by or under this Consent Decree shall be enforceable under this Consent Decree regardless of whether such term has or will become part of a Title V permit.

87.　Title V Permitting.　Prior to the termination of this Consent Decree, Cleveland Thermal shall submit a complete application to Ohio EPA to modify, amend, or revise the Hamilton Avenue Facility's Title V Permit to incorporate the limits and standards set forth in the federally enforceable Permit-to-Install required by Paragraph 22.　If Cleveland Thermal elects to

50

install a New NG Cogen Facility pursuant to Paragraph 24, then, prior to the termination of this Consent Decree, Cleveland Thermal also shall submit a complete application to Ohio EPA for a Title V permit for that New NG Cogen Facility that incorporates the limits and standards set forth in the federally enforceable Permit-to-Install required by Paragraph 24.

88.     A copy of all written and/or electronic correspondence (including all attachments and follow-up information) submitted to Ohio EPA pursuant to Paragraph 87 or received from Ohio EPA as a result of such correspondence shall be sent to EPA by email at the addresses listed in Section XVI (Notices) at the same time any such correspondence is either sent to Ohio EPA or received from Ohio EPA, as applicable.

## XV.   INFORMATION COLLECTION AND RETENTION

89.     Any authorized representative of the United States, including its attorneys, contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the premises of the Facility at any reasonable time for the purposes of:

a.     monitoring the progress of activities required under this Consent Decree;

b.     verifying any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c.     obtaining samples and, upon request, splits of any samples taken by Cleveland Thermal or its representatives, contractors, or consultants; and

d.     assessing Cleveland Thermal's compliance with this Consent Decree.

90.     Cleveland Thermal shall retain, and instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) that are now in or come in to its or its contractors' or agents' possession or control, and that relate to Cleveland Thermal's performance of its obligations under this Consent Decree until two years after termination of this Consent Decree.   This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.   At any time during

51

the document retention period, upon request by EPA, Cleveland Thermal shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

91.     All information and documents submitted by Cleveland Thermal pursuant to this Consent Decree shall be subject to any requests under applicable law providing public disclosure of documents unless (a) the information and documents are subject to legal privileges or protection, or (b) Cleveland Thermal claims and substantiates in accordance with 40 C.F.R. Part 2 Subpart B that the information and documents contain confidential business information.   If Cleveland Thermal asserts such a privilege, it shall provide the following in a manner that does not result in the waiver of the privilege:    (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Cleveland Thermal.   However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

92.     Nothing in this Consent Decree shall limit the authority of EPA to conduct tests and inspections at Cleveland Thermal's Facility under Section 114 of the Act, 42 U.S.C. § 7414, or any other applicable federal laws, regulations, or permits.

## XVI.  NOTICES

93.     Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

**<u>As to the United States of America:</u>**

(if by United States regular mail service)
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
DJ# 90-5-2-1-10579

(if by overnight or express delivery service)
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
ENRD Mailroom, Room 2121
601 D Street, NW
Washington, DC 20004
DJ# 90-5-2-1-10579

and

(if by United States regular mail or overnight or express delivery service)
Compliance Tracker
Air Enforcement & Compliance Assurance Branch
U.S. Environmental Protection Agency, Region 5
77 W. Jackson Blvd. (AE-17J)
Chicago, IL 60604

and

Mary McAuliffe
Associate Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 W. Jackson Blvd. (C-14J)
Chicago, IL 60604

and

Raymond Cullen
Environmental Engineer
Air and Radiation Division
U.S. Environmental Protection Agency, Region 5
77 W. Jackson Blvd. (AE-17J)
Chicago, IL    60604

Email copies shall be made to:

mcauliffe.mary@epa.gov
Cullen.raymond@epa.gov

**As to Cleveland Thermal**:

Mr. Donald J. Hoffman
2000 Paradise Ridge Road
Mosier, OR 97040-9717

Mark Divis
Cleveland Thermal, LLC
1921 Hamilton Avenue
Cleveland, Ohio, 44114

and

Terrence S. Finn
Roetzel and Andress
222 S. Main St.
Suite 400
Akron, OH 44308

94.     Except where this Consent Decree requires notifications, communications, or submissions to be sent by email, all other notifications, communications, or submissions made pursuant to this Section shall be sent either by: (a) overnight mail or overnight delivery service with signature required for delivery, or (b) certified or registered mail, return receipt requested. All notifications, communications, and transmissions sent by overnight, certified, or registered mail shall be deemed submitted on the date they are postmarked, or, if sent by overnight delivery service, they shall be deemed submitted on the date they are delivered to the delivery service. Courtesy copies of all notifications, communications, or submissions shall be sent by electronic mail to the electronic addresses set forth above.

95.     Where this Consent Decree requires notifications, communications and submissions to be sent by email, submission shall be made to only: mcauliffe.mary@epa.gov

54

and cullen.raymond@epa.gov

96.  To the extent a notification, communication or submission is too large to email, any electronic method of transmission agreed to by the Parties shall satisfy the requirements of this Paragraph.

97.  Either Party may change either the notice recipient or the address for providing notices to it by serving the other Party with a notice setting forth such new notice recipient or address.

## XVII.  EFFECTIVE DATE

98.  The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Cleveland Thermal hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective Date.   In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate and shall be void.

## XVIII.  RETENTION OF JURISDICTION

99.  The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree, entering orders modifying this Decree (pursuant to Sections XIII (Dispute Resolution) or XIX (Modification)), or effectuating or enforcing compliance with the terms of this Decree.

## XIX.  MODIFICATION

100.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.   Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

## XX.    INTEGRATION

101.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.   No other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXI.    COSTS

102.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Cleveland Thermal.

## XXII.  SIGNATORIES AND SERVICE

103.    Each undersigned representative of Cleveland Thermal and the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice or his designee certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

104.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

105.    Cleveland Thermal hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

106.    Unless otherwise ordered by the Court, the United States agrees that Cleveland Thermal will not be required to file any answer or other pleading responsive to the Complaint in this matter until and unless the Court expressly declines to enter this Consent Decree, in which case Cleveland Thermal shall have no less than 30 days after receiving notice of such express declination to file an answer or other pleading in response to the Complaint

## XXIII.   PUBLIC COMMENT

107.    This Consent Decree shall be lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with 28 C.F.R. § 50.7.   The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.   Cleveland Thermal consents to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Cleveland Thermal in writing that it no longer supports entry of the Decree.

## XXIV.   TERMINATION

108.    Cleveland Thermal may submit to the United States a Request for Termination of this Consent Decree after complying with the following:

      a.      Completion of the requirements of Section IV (Compliance Requirements), including the revocation or elimination of authorization to Operate Boilers 101, 102, 104, 5, 6, and the Selected Oil-Fired Boiler;

      b.      Continuous satisfactory compliance with this Consent Decree for a period of two years prior to termination;

      c.      Receipt of a Title V Permit(s) or permit amendment(s) as required by Paragraph 87;

      d.      Compliance with all other requirements of this Consent Decree, including those relating to the Environmental Projects required by Section VI (Environmental Mitigation Projects); and

      e.      Payment of the civil penalty and any accrued stipulated penalties as required by this Consent Decree.

In making a Request for Termination, Cleveland Thermal shall provide all necessary supporting documentation.

109.    Following receipt by the United States of Cleveland Thermal's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Cleveland Thermal has satisfactorily complied with the requirements for termination of this Consent Decree.   If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint motion, with a proposed order, terminating the Decree.

110.    If the United States does not agree that the Decree may be terminated, Cleveland Thermal may invoke Dispute Resolution under Section XIII (Dispute Resolution).   However, Cleveland Thermal shall not seek Dispute Resolution of any dispute regarding termination until 60 days after service of its Request for Termination.

## XXV.   FINAL JUDGMENT

111.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Cleveland Thermal.   The

Court finds that there is no just reason for delay and therefore enters this judgment as a final

judgment under Fed. R. Civ. P. 54 and 58.


Dated this _____ day of   _____, _____.


_____
UNITED STATES DISTRICT JUDGE
Northern District of Ohio

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Cleveland Thermal, LLC.* (N.D. Ohio), subject to public notice and comment.

FOR PLAINTIFF THE UNITED STATES OF AMERICA

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

ANNETTE M. LANG
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C.   20044-7611
Phone:   (202) 514-4213
Fax:   (202) 616-6584
annette.lang@usdoj.gov

STEVEN M. DETTELBACH
United States Attorney
Northern District of Ohio

By:     s/ Steven J. Paffilas
STEVEN J. PAFFILAS (0037376)
Assistant United States Attorney
Northern District of Ohio
801 W. Superior Avenue
Suite 400
Cleveland, Ohio 44113
Phone:   (216) 622-3698
Fax:   (216) 522-4982
steven.paffilas@usdoj.gov

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Cleveland Thermal, LLC.* (N.D. Ohio), subject to public notice and comment.

FOR UNITED STATES ENVIRONMENTAL AGENCY

<u>s/ Susan Hedman\*\*\*</u>
SUSAN HEDMAN
Regional Administrator
U.S. Environmental Protection Agency, Region 5
77 West Jackson Blvd. (mail code: R-19J)
Chicago, Illinois   60604-10207

MARY T. McAULIFFE
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 West Jackson Blvd. (mail code: C-14J)
Chicago, Illinois   60604-10207
Phone: (312) 886-6237

\*\*\*Signed with permission.

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Cleveland Thermal, LLC*, (N.D. Ohio).

FOR CLEVELAND THERMAL, LLC

Date: 8/28/2015

s/ Donald J. Hoffman***
DONALD J. HOFFMAN, CHAIRMAN
Cleveland Thermal, LLC
1921 Hamilton Ave.
Cleveland, OH 44114-1112

***Signed with permission.

*United States v. Cleveland Thermal, LLC (N.D. Ohio)*

# Consent Decree

# APPENDIX A

<u>**APPENDIX A**</u>

**ENVIRONMENTAL MITIGATION PROJECTS**

Cleveland Thermal shall spend at least $350,000, and shall comply with the requirements of this Appendix and with Section VI of the Consent Decree (Environmental Mitigation Projects) to implement and secure the environmental benefits of the Environmental Projects described below.  Nothing in the Consent Decree or this Appendix shall require Cleveland Thermal to spend more than a total of $350,000 on Environmental Projects.  Cleveland Thermal's performance of one or more of the Environmental Projects described herein shall satisfy the requirements of Section VI of this Consent Decree, provided Cleveland Thermal spends at least $350,000 in Project Dollars.

I.        <u>**Overall Schedule and Budget for Environmental Projects**</u>

        A.        By no later than 120 Days after the Date of Entry of this Consent Decree, Cleveland Thermal shall submit (a) proposed plan(s) to EPA ("Project Plan") for review and approval pursuant to Section X of the Consent Decree (Review and Approval of Submittals) for spending at least $350,000 Project Dollars for one or more of the Projects listed in Sections II through V of this Appendix.  Cleveland Thermal shall complete the Project(s) within the following time periods:

                1.        For Potential Projects 1, 3, and 4, three years from the later of: (i) the Date of Entry of the Consent Decree; or (ii) Project Plan approval.

                2.        For Potential Project 2, 180 days after the Date of Entry.

            EPA reserves the right to disapprove any project after an analysis of the Project Plan and potential environmental impacts.

        B.        Cleveland Thermal may perform one or more Projects listed in Sections II through V of this Appendix.

        C.        Cleveland Thermal may, at its election, consolidate the Project Plans required by this Appendix into one or more Project Plans.

        D.        All proposed Project Plans shall include the following:

                1.        A plan for implementing the Project.
                2.        A summary-level budget for the Project.
                3.        A description of the roles of any third-parties involved in the Project
                4.        A time line for implementation of the Project; the dates in the time line shall be keyed off of the Date of Entry of this Consent Decree.

     5.     A description of the anticipated environmental benefits of the Project including, if feasible, an estimate of emission reductions (e.g., $SO_2$, $NO_X$, PM, mercury, $CO_2$) expected to be realized.

E.     Upon approval by EPA of the Project Plan(s) required by this Appendix, Cleveland Thermal shall complete the approved Projects according to the approved Project Plan(s).  If EPA approves the Project Plan(s) prior to Entry of this Consent Decree, Cleveland Thermal is not required to commence the Project(s) until after Entry.  Nothing in this Consent Decree, however, shall be interpreted to prohibit Cleveland Thermal from completing the Project(s) ahead of schedule.

F.     Commencing with its first progress report due pursuant to Section IX of the Consent Decree (Periodic Reporting), and continuing quarterly thereafter until completion of the Project(s), Cleveland Thermal will include in the progress report information describing the progress of each Project and the Project Dollars expended on each Project to date.

G.     In accordance with the requirements of Paragraph 41 of the Consent Decree, within ninety (90) days following the completion of each Project, Cleveland Thermal shall submit to the United States for approval, a Project completion report that documents:

     1.     The date the Project was completed;

     2.     The results and documentation of implementation of the Project, including the estimated emission reductions, if feasible, or other environmental benefits achieved;

     3.     The Project Dollars incurred by Cleveland Thermal in implementing the Project; and

     4.     Certification by an authorized representative in accordance with Paragraph 54 of the Consent Decree that the Project has been completed in full satisfaction of the requirements of the Consent Decree and this Appendix.

H.     If EPA concludes based on the Project completion report or subsequent information provided by Cleveland Thermal that a Project has been performed and completed in accordance with the Consent Decree, EPA will approve completion of the Project for purposes of the Consent Decree.

II.      **Potential Project #1:  Cuyahoga Valley National Park Land Acquisition and/or Restoration Project**

A.      Consistent with the requirements of Section I of this Appendix, Cleveland Thermal may submit a Project Plan to EPA for review and approval for the use of up to $350,000 in Project Dollars for the acquisition and/or restoration of lands that are part of or adjacent to the Cuyahoga Valley National Park and have an ecological or environmental significance to the ecosystems of the Cuyahoga Valley National Park.

B.      The goal of this Project is the protection through acquisition and/or restoration of ecologically significant land, vegetation, and forests which use adaptive management techniques designed to improve ecosystem health and mitigate harmful effects from air pollution.

For purposes of this Appendix and Section VI (Environmental Projects) of this Consent Decree, land acquisition means the purchase of interests in land, including fee ownership, easements, or other restrictions that run with the land that provide for the perpetual protection and maintenance of the acquired land. Restoration may include (but is not limited to), reforestation or revegetation (using plants native to the area) and/or removal of non-native, invasive plant species.  To the extent that land being restored is not already within the Cuyahoga Valley National Park, any restoration action must incorporate the acquisition of an interest in the restored lands sufficient to ensure perpetual protection of the restored land.

C.      In addition to the information required by Section I of this Appendix, the Project Plan shall include:

1.      A general description of the areas proposed to be acquired or restored, including a map clearly identifying the location of the land relative to the Cuyahoga Valley National Park in the area surrounding the proposed land to be acquired.

2.      A justification of why the area should be considered ecologically and/or environmentally significant and warrants preservation.

3.      A description of the projected cost of the land acquisition.

4.      An identification of any person or entity(s) other than Cleveland Thermal that will be involved in the land acquisition.  Cleveland Thermal shall describe the third-party's roles in the action and the basis for asserting that such entity is able and suited to perform the intended role.  Any proposed third-party must be legally authorized to perform the proposed action or receive Project Dollars.

5.      A schedule for completing and funding the project.

D.      Performance:  All Project Dollars shall be expended in accordance with subsections A through C above and by three years after the later of: (i) EPA's plan approval; or (ii) the Date of Entry of the Consent Decree.

E.      Project Completion Report:  In addition to the information required by Section I of this Appendix, Cleveland Thermal's project completion report for this Project shall include any reports related to this Project that any applicable third party fund or organization provided to Cleveland Thermal.

## III.    Potential Project #2:  National Park Service Land Restoration Project

A.      National Park Service Mitigation:  By no later than 180 days after the Date of Entry, Cleveland Thermal may pay to the National Park Service up to $150,000 to be used in accordance with the Park System Resource Protection Act, 16 U.S.C. § 19jj, for the restoration of land, watersheds, vegetation, and forests using techniques designed to improve ecosystem health and mitigate harmful effects from air pollution.  The Project(s) shall focus on the Cuyahoga Valley National Park.

B.      Payment of the amount specified in the preceding Paragraph shall be made to the Natural Resource Damage Assessment and Restoration Fund managed by the United States Department of the Interior.  Instructions for transferring funds will be provided to Cleveland Thermal by the National Park Service.  Notwithstanding Subsection III.A of this Appendix, payment of funds is not due until ten (10) days after receipt of payment instructions.  Upon payment of the required funds into the Natural Resource Damage Assessment and Restoration Fund, Cleveland Thermal shall have no further responsibilities regarding the implementation of any project selected by the National Park Service in connection with this provision.

## IV.    Potential Project #3:  Alternative Fuels Vehicle Project

A.      Consistent with the requirements of Section I of this Appendix, Cleveland Thermal may propose a Project Plan to EPA for review and approval to spend up to $350,000 Project Dollars to replace gasoline and diesel powered fleet vehicles (passenger cars, light trucks, and heavy duty service vehicles) with newly manufactured Alternative Fuels Vehicles (as defined below).  Only publicly-owned vehicles operating within the City of Cleveland shall qualify for this Project.  The replacement of gasoline and diesel vehicles with Alternative Fuels Vehicles will reduce emissions of $NO_X$, PM, VOCs, and other air pollutants. Any Alternative Fuel Vehicle shall meet all applicable engine standards, certifications, and/or verifications required by law.

A–4

B.    Definitions for Project Plan:

    1.    "Alternative Fuels Vehicle" means a Plug in Hybrid Vehicle, Electric Vehicle, or Compressed Natural Gas Vehicle.

    2.    "Plug in Hybrid Vehicle" means a vehicle that can be charged from an external source and can generate, store, and utilize electric power to reduce the vehicle's consumption of fossil fuel. These vehicles typically include a larger battery pack to allow an extended range of operation without the use of the gasoline or diesel engine.

    3.    "Electric Vehicle" means a vehicle that does not utilize an internal combustion engine and instead relies entirely on battery power for propulsion.

    4.    "Compressed Natural Gas Vehicle" means a vehicle fueled solely by compressed natural gas.

C.    In addition to the requirements of Section I, the Project Plan will also satisfy the following criteria:

    1.    Ensure that all Alternative Fuels Vehicles proposed for inclusion in this program will be regular production models that meet all applicable engine standards, certifications or verifications;

    2.    Include a schedule and budget for completing the replacement program;

    3.    Describe the process and criteria Cleveland Thermal will use to: (i) select the publicly-owned vehicles within the City of Cleveland that will be eligible to participate in the replacement program; and (ii) solicit interest in participating in the program.

    4.    Prioritize the public fleets in the City of Cleveland that will be selected for participation in this Project, including consideration of such issues as environmental justice and air quality.

    5.    Describe the rationale and basis (including a discussion of cost) for selecting the make and model of the Alternative Fuel Vehicles chosen for this Project, including information about other available vehicles and why such vehicles were not selected.

    6.    Describe the final disposition of the vehicles that are being replaced.

    7.    Propose a method to account for the amount of Project Dollars that will be credited for each replaced vehicle, taking into account the incremental

costs of Alternative Fuel Vehicles compared to similar conventional vehicles and the potential savings associated with the replacement;

8.      Provide a method of determining the net present value of the savings of Alternative Fuel Vehicles as compared to similar conventional vehicles;

9.      Certify that the Alternative Fuel Vehicles will be retained and operated for their useful life;

10.     Prioritize the replacement of diesel-powered vehicles to the greatest extent practical and available;

11.     Prioritize the replacement of older higher emitting, high utilization vehicles; and

12.     Identify any person or entity, other than Cleveland Thermal, that will be involved in the Project. This does not include vehicle manufacturers or dealers who would provide vehicles but does include any proposed third party who would have a coordination or project management role in the replacement program.

D.      With respect to costs associated with this Project, Cleveland Thermal shall receive credit toward Project Dollars only for the incremental cost of Alternative Fuels Vehicles as compared to the cost of a newly manufactured, similar motor vehicle powered by conventional diesel or gasoline engines minus the scrap value of the vehicle disposed of.  Cleveland Thermal shall also receive credit toward Project Dollars for costs associated with infrastructure needed to support such Project to the extent such need is demonstrated and approved by EPA.

## V.    <u>Potential Project #4:  Solar/Thermal Technologies Project</u>

A.      Consistent with the requirements of Section I of this Appendix, Cleveland Thermal may propose a Plan to EPA for review and approval to spend up to $350,000 Project Dollars to install conventional flat panel or thin film solar photovoltaics ("PV Project") and/or solar thermal water ("Thermal Project) at (a) state or local government-owned property(ies) and/or property(ies) owned by nonprofit groups.  All properties must be located within the City of Cleveland. Cleveland Thermal shall implement the PV and/or Thermal Project(s) as described below.

B.      <u>PV Project</u>.

1.      A PV Project shall, at a minimum, consist of:  (i) the installation of solar panels at a single location with unrestricted solar access, producing at least 10 kilowatts direct current, or, if Cleveland Thermal can demonstrate in its

Project Plan that it has the same cost-effectiveness as a 10 kilowatt direct current project (*e.g.*, kilowatt capacity per Project Dollar expenditure), producing at least 5 kilowatts direct current, but not to exceed, in either case, the total annual electricity baseload of the property the project serves; (ii) a grid-tied inverter, appropriate sized for the capacity of the solar panels installed at the location; (iii) the appropriate solar panel mounting equipment for the type of roof or project site location at the particular school, government-owned property, or property owned by the nonprofit group(s) selected (*i.e.*, roof mount or ground mount); (iv) wiring, conduit, and associated switchgear and metering equipment required for interconnecting the solar generator to the utility grid; and (v) appropriate monitoring equipment support by kiosk-delivered educational software to enable the school students and/or staff to monitor the total and hourly energy output of the system (kilowatt hours), environmental benefits delivered (*e.g.*, pounds of carbon dioxide avoided), hourly ambient temperature and cell temperature (degrees Centigrade), irradiance (W/M2), as well as time sensitive voltage, power and current metrics.

2.  The PV Project shall be installed on the customer side of the meter and ownership of the system shall be conveyed to the owner at the site.  All related environmental benefits, including renewable energy certificates, shall be retained by the system owner (the "Project Beneficiary").

3.  Cleveland Thermal shall use the North American Board of Certified Energy Practitioners ("NABCEP") to perform the design and installation of the PV Project to ensure the highest quality installation and performance of the system.

4.  Cleveland Thermal shall include in its bid proposals the requirement that the major subcomponents of the PV System include a manufacturer parts warranty (*e.g.,* PV modules, inverter) and a service contract ("Project Service Contract," both described in Subsection V.D.  The Project Service Contract will be delivered through a third-party provider (system integrator or service provider) but be administered by Cleveland Thermal by way of payment through the escrow account specified in Subsection V.E.

C.     Thermal Project

    1.     A Thermal Project shall, at a minimum, consist of:  (i) the proper installation of solar thermal technologies at a single location with unobstructed solar access, using active direct or indirect systems with OG-100 or OG-300 certification from the Solar Rating and Certification Corporation; (ii) use of industry best practices in sizing the solar thermal collectors' surface area to match the intended storage tank and end use application; (iii) appropriate monitoring equipment supported by kiosk-delivered educational software to enable school students and/or staff to monitor the total and hourly thermal energy output of the system, operating parameters, and environmental benefits delivered; and (iv) installed systems should provide adequate and redundant freeze projection appropriate for the systems' climate region.

    2.     The Thermal Project shall be installed on the customer side of the meter and ownership of the system shall be conveyed to the owner at the site. All related environmental benefits, including renewable energy certificates or carbon offsets, shall be retained by the system owner (the "Project Beneficiary").

    3.     Cleveland Thermal shall use NABCEP-certified energy professional to perform the design and installation of the Thermal Project to ensure the highest quality installation and performance of the system.

    4.     Cleveland Thermal shall include in its bid proposals the requirement that the major subcomponents of the Thermal System include manufacturer parts warranty and a Project Service Contract, both described in Subsection V.D.  The Project Service Contract will be delivered through a third-party provider (system integrator or service provider) but be administered by Cleveland Thermal by way of payment through the escrow account specified in Subsection V.E.

D.     Manufacturer Warranty and Project Service Contract:  The Plan for any PV and/or Thermal Project shall include the requirement for:  (i) a manufacturer parts warranty for the solar panels for 25 years and invertors for 10 years (for the PV Project); and (ii) a Project Service Contract for maintenance of the Project for 25 years from the date of installation.  The Project Service Contract shall include but not be limited to annual system checkups, solar module cleaning, and normal Project component replacements, including installation of new system components as needed to extend the life of the Project through the termination of the Project Service Contract term.

E.     Cleveland Thermal shall purchase the Project Service Contract for the benefit of the Project Beneficiary and shall fund the costs of the Project Service Contract by

A–8

depositing funds in an escrow account for the use by the Project Beneficiary solely for the purpose of maintaining the system for the life of the Project.

F.    In addition to the requirements of Section I, the Project Plan shall also include the following information:

    1.    A schedule and budget for completing the PV and/or Thermal Project(s).

    2.    A detailed accounting supporting the costs and activities associated with the Project Service Contract; the schedule and monetary installments for deposits to an escrow account to support operation and maintenance activities over the life of the system; and a demonstration that the escrow account includes appropriate restrictions on the Project Beneficiary's use of such funds (*i.e.*, solely for purposes of maintaining the Project).

    3.    A description of the process that Cleveland Thermal will use to notify potential Project Beneficiaries of their eligibility to participate in the Project and the means that Cleveland Thermal will use to solicit their interest in participating.

    4.    A description of the process and criteria that Cleveland Thermal will use to select the final Project Beneficiary(ies), including baseload electricity or steam usage, thermal load, solar access availability, low income neighborhood schools and other relevant criteria.

    5.    An identification of any person or entity other than Cleveland Thermal that will be involved in the PV or Thermal Project(s); a description of the third-party's role in the PV or Thermal Project(s); a statement setting forth the basis for asserting that such entity is able and suited to perform the intended role; and the competitive bidding process used to solicit third-party interest.  Any third-party retained for the Project must be legally authorized to perform the proposed roles and to receive Project Dollars.

G.    In addition to the information required by Subsection I.G, Cleveland Thermal's final report for the Project(s) shall also identify the government and/or nonprofits-owned properties where the PV and/or Thermal Project(s) were installed, the size of the system(s), the components installed, the total cost(s) and expected energy output and environmental benefits, and any lessons learned.

*United States v. Cleveland Thermal, LLC (N.D. Ohio)*

# Consent Decree

# APPENDIX B



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

OCT 2 8 2010

REPLY TO THE ATTENTION OF:

AE-17J

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mark Divis
Cleveland Thermal, LLC
1921 Hamilton Avenue
Cleveland, Ohio 44114-1112

      RE:    Notice of Violation issued to Cleveland Thermal, LLC

Dear Mr. Divis:

      The U. S. Environmental Protection Agency is issuing the enclosed Notice of Violation (NOV) to Cleveland Thermal, LLC.  This NOV is issued in accordance with Section 113(a) of the Clean Air Act (the Act), 42 U.S.C. § 7413(a).

      EPA has determined that Cleveland Thermal, LLC is violating the Ohio State Implementation Plan (SIP) and its Title V permits at its Hamilton and Canal steam generation plants.

      EPA is offering you an opportunity to confer with us about the violations cited in the NOV.  The conference will give you an opportunity to present information on the specific findings of violations, and the steps you will take to bring the facilities into compliance.  Please plan for your technical and management personnel to attend the conference to discuss compliance measures and commitments.  You may have an attorney represent you at this conference.

The EPA contact in this matter is Katharina Bellairs. You may call her at (312) 353-1669 to request a conference. You should make your request for a conference no later than 10 calendar days after you receive this letter, and we should hold any conference within 30 calendar days of your receipt of this letter.

Sincerely,

*Michael Harris* for C.N

Cheryl L. Newton
Director
Air and Radiation Division

Enclosure

cc:

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
### REGION 5

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| | ) |
| Cleveland Thermal, LLC | )    **Proceedings Pursuant to** |
| | )    **Section 113(a)(1) of the** |
| Cleveland, Ohio | )    **Clean Air Act,** |
| | )    **42 U.S.C. § 7413(a)(1)** |
| | ) |
| | )    **EPA-5-11-OH-02** |
| | ) |

## NOTICE OF VIOLATION

The U.S. Environmental Protection Agency (EPA) is issuing this Notice of Violation (NOV) under Section 113(a)(1) of the Clean Air Act (the Act), 42 U.S.C. § 7413(a)(1). The authority to issue this NOV has been delegated to the Regional Administrator of EPA Region 5, and redelegated to the Director, Air and Radiation Division. EPA finds that Cleveland Thermal, LLC violated the Act, 42 U.S.C. §§ 7401 *et seq.*, the Ohio State Implementation Plan, and its Part 70 operating permit, at both of its fossil-fuel fired steam generation plants: the Canal Plant and the Hamilton Plant located in Cleveland, Cuyahoga County, Ohio.

## STATUTORY AND REGULATORY BACKGROUND

1. The Ohio Environmental Protection Agency (Ohio EPA) issued Title V Permit P0094245 (Title V Permit) to Cleveland Thermal on January 16, 2003. Part III.A.I.1. of the Title V Permit prohibits boilers B001, B002, B003, B10l, B102, and B104 from emitting visible emissions that exceed 20 percent opacity as a six-minute average, except as provided by Ohio Administration Code (OAC) rule 3745-17-07(A).

2. OAC rule 3745-17-07(A)(1)(a) states that "[e]xcept as otherwise specified in paragraphs (A)(1)(b), (A)(2) and (A)(3) of this rule, visible particulate emissions from any stack shall not exceed twenty per cent opacity, as a six-minute average."

3. OAC rule 3745-17-07(A)(1)(b) states that "[e]xcept as otherwise specified in paragraphs (A)(2) and (A)(3) of this rule, visible particulate emissions from any stack may exceed twenty percent opacity, as a six-minute average, for not more than six consecutive minutes in any sixty minutes, but shall not exceed sixty percent opacity, as a six-minute average, at any time."

4. OAC rule 3745-17-07(A)(3) states that "[t]he visible particulate emission limitations established in paragraph (A)(1) of this rule shall not apply to the following:

    a) The start-up of the following fuel burning equipment: (ii) For any fuel burning equipment which are uncontrolled or which are equipped solely with mechanical collectors . . . for the control of particulate emissions, for a period of not more than three hours from the moment of start-up. . . .

    b) The shutdown of the following fuel burning equipment: (ii) For any fuel burning equipment which are uncontrolled or which are equipped solely with mechanical collectors . . . for the control of particulate emissions, for a period of not more than three hours. . . .

    c) The malfunction of any air contaminant source or the malfunction/shutdown of air pollution control equipment associated with any air contaminant source, if the owner or operator of said air contaminant source or air pollution control equipment complies with the requirements of rule 3745-15-06 of the Administrative Code and none of the conditions listed in paragraph (C) of rule 3745-15-06 of the Administrative Code exists.

    d) Intermittent soot-blowing operations (the cleaning of heat transfer surfaces with pressurized air or steam) for fuel burning equipment which are uncontrolled or which are equipped solely with mechanical collectors . . . for the control of particulate emissions. . . ."

5. OAC rule 3745-15-06(B) states that "[m]alfunctions of air pollution control equipment shall be reported as follows: (1) . . . the person responsible for such equipment shall immediately notify the Ohio Environmental Protection Agency district office or delegate agency of such failure or breakdown. . . ."

6. OAC rule 3745-15-06(C) states "[t]he director retains the responsibility to evaluate any report submitted pursuant to this rule. The director shall take appropriate action upon a determination that the reporting requirements of this rule have not been satisfied, that the equipment was not properly operated and maintained prior to breakdown, that shutdown of the source or operation during the period of maintenance or breakdown was or has become practicable, that the shutdown or breakdown was or has become avoidable, or was induced or prolonged in bad faith, or that the emissions endanger or tend to endanger the health or safety of the public."

## FACTUAL BACKGROUND

7. Cleveland Thermal, LLC is located in Cleveland, Cuyahoga County, Ohio.

8. Cuyahoga County is classified as non-attainment for PM-2.5 and was classified as non-attainment for 8-hour ozone from 2005 to 2008. The county is currently in attainment for PM-10, 8-hour ozone, $NO_x$, and $SO_2$.

2

4.  The Canal Plant is a coal-fired steam generating station and has the potential to emit more than 100 tons per year each of particulate matter (PM).  The plant consists of three operational chain-grate wet-bottom boilers, B101, B102, and B104, originally constructed in 1948.  Each boiler has a capacity to generate 228 mmBTU/hour.

5.  The Hamilton Plant operates three oil-fired steam generating units and has the potential to emit more than 100 tons per year of particulate matter (PM).  The boilers, B001, B002, and B003, were originally constructed in 1928.  Each oil-fired boiler has a capacity to generate 170 mmBTU/hour.

6.  Based upon review of Cleveland Thermal's  Excess Emissions Reports submitted for the Cleveland Thermal steam generating plant for 1st Quarter 2005 to $2^{th}$ Quarter 2009, the Canal facility reported exceedances of the 20 percent, 6-minute average opacity limitations not allowable under OAC rule 3745-17-07(A) of at least 4,323 minutes.  Quarterly exceedances are described in Table 1 below:

### Table 1: Minutes of Opacity Violations for Canal Station:

| Quarter/Year | 20% Opacity Exceedance (Minutes) | | | |
|---|---|---|---|---|
| | Boiler B101 | Boiler B102 | Boiler B104 | Total |
| 1st Q. 2005 | 36 | 48 | 162 | 246 |
| 2nd Q. 2005 | 30 | 130 | 36 | 196 |
| 3rd Q. 2005 | 72 | 54 | 0 | 126 |
| 4th Q. 2005 | 12 | 12 | 150 | 174 |
| 1st Q. 2006 | 0 | 168 | 282 | 450 |
| 2nd Q. 2006 | 36 | 114 | 348 | 498 |
| 3rd Q. 2006 | 138 | 0 | 36 | 174 |
| 4th Q. 2006 | 84 | 102 | 132 | 318 |
| 1st Q. 2007 | 221 | 12 | 66 | 299 |
| 2nd Q. 2007 | 48 | 30 | 0 | 78 |
| 3rd Q. 2007 | 126 | 498 | 78 | 702 |
| 4th Q. 2007 | 300 | 162 | 66 | 528 |
| 1st Q. 2008 | 186 | 0 | 72 | 258 |
| 2nd Q. 2008 | 138 | 12 | 0 | 150 |
| 3rd Q. 2008 | 12 | 0 | 0 | 12 |
| 4th Q. 2008 | 0 | 36 | 0 | 36 |
| 1st Q. 2009 | 0 | 18 | 0 | 18 |
| 2nd Q. 2009 | 12 | 12 | 36 | 60 |

7. Based upon review of Cleveland Thermal's Excess Emissions Reports submitted for the Cleveland Thermal steam generating plant for 1st Quarter 2005 to 2th Quarter 2009, the Hamilton facility reported exceedances of the 20 percent, 6-minute average opacity limitations not allowable under OAC rule 3745-17-07(A) of at least 1,116 minutes. Quarterly exceedances are described in Table 2 below:

**Table 2: Minutes of Violations of Opacity for Hamilton Station:**

| Quarter/Year | 20% Opacity Exceedance (Minutes) | | | |
|---|---|---|---|---|
| | Boiler B001 | Boiler B002 | Boiler B003 | Total |
| 1st Q. 2005 | 72 | 78 | 48 | 198 |
| 2nd Q. 2005 | 0 | 48 | 0 | 48 |
| 3rd Q. 2005 | 18 | 0 | 0 | 18 |
| 4th Q. 2005 | 54 | 36 | 0 | 90 |
| 1st Q. 2006 | 30 | 0 | 0 | 30 |
| 2nd Q. 2006 | 42 | 6 | 0 | 48 |
| 3rd Q. 2006 | 0 | 0 | 0 | 0 |
| 4th Q. 2006 | 150 | 24 | 18 | 192 |
| 1st Q. 2007 | 18 | 114 | 12 | 144 |
| 2nd Q. 2007 | 12 | 0 | 0 | 12 |
| 3rd Q. 2007 | 6 | 0 | 0 | 6 |
| 4th Q. 2007 | 174 | 24 | 42 | 240 |
| 1st Q. 2008 | 24 | 18 | 0 | 42 |
| 2nd Q. 2008 | 12 | 0 | 6 | 18 |
| 3rd Q. 2008 | 0 | 0 | 0 | 0 |
| 4th Q. 2008 | 24 | 0 | 0 | 24 |
| 1st Q. 2009 | 0 | 0 | 0 | 0 |
| 2nd Q. 2009 | 6 | 0 | 0 | 6 |

## VIOLATIONS

8. Cleveland Thermal violated the Ohio SIP and Cleveland Thermal's Part 70 operating permit including condition Part III.1.I.1. by failing to continuously comply with the 20%, 6-minute average opacity limitation as outlined by OAC rule 3745-17-07(A) at the Canal steam generation plant.

9. Cleveland Thermal violated the Ohio SIP and Cleveland Thermal's Part 70 operating permit including condition Part III.1.I.1. by failing to continuously comply with the 20%, 6-minute average opacity limitation as outlined by OAC rule 3745-17-07(A) at the Hamilton steam generation plant.

## ENFORCEMENT AUTHORITY

16. Section 113(a) (1) of the Act, 42 U.S.C. § 7413(a)(1), provides that at any time after the expiration of 30 days following the date of the issuance of a NOV, the Administrator may, without regard to the period of violation, issue an order requiring compliance with the requirements of the state implementation plan or permit, issue an administrative penalty order pursuant to Section 113(d), or bring a civil action pursuant to Section 113(b) for injunctive relief and/or civil penalties.

## ENVIRONMENTAL IMPACT

17. Violations of the PM and opacity standards increase public exposure to unhealthy particulate matter. PM, especially fine PM, contributes to respiratory problems, lung damage and premature deaths.

Dated _10/28/10_

_Michael Harris_ for C.N
Cheryl L. Newton
Director
Air and Radiation Division

5

CERTIFICATE OF MAILING

I, Tracy Jamison, certify that I sent a Notice of Violation No. **EPA-5-11-OH-02,**

by Certified Mail, Return Receipt Requested, to:

      Mark Divis
      Cleveland Thermal, LLC
      1921 Hamilton Avenue
      Cleveland, Ohio 44114-1112

I also certify that I sent a copy of the Request to Provide Information Pursuant to the

Clean Air Act by First Class Mail to:

      Bob Hodanbosi
      Chief, Division of Air Pollution Control
      Ohio Environmental Protection Agency
      1800 WaterMark Drive
      Columbus, Ohio 43266-1049

On the _28_ day of _October_ 2010.

                                _Tracy Jamison_
                          Tracy Jamison, Administrative Assistant
                          AECAS (MI/WI)

Certified Mail Receipt Number: _7009 1680 0000 7670 4014_

standard bcc's: official file copy w/attachment(s)
                     originating organization reading file w/attachment(s)


other bcc's:    Mary McAuliffe C-14J (w/attach)
                   David Schulz, AE-17J (w/attach)


| Creation Date: | October 22, 2010 |
|---|---|
| Filename: | G:\Air Enforcement And Compliance Branch\MI and WI\Bellairs\Cleveland Thermal NOV.doc |
| Legend: | ARD:AECAB:AECAS(MI/WI):KRB |



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

JUN 2 9 2011

REPLY TO THE ATTENTION OF:

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mark Divis
Cleveland Thermal, LLC
1921 Hamilton Avenue
Cleveland, Ohio 44114-1112

RE:    Notice and Finding of Violation issued to Cleveland Thermal, LLC

Dear Mr. Divis:

The U. S. Environmental Protection Agency is issuing the enclosed Notice and Finding of Violation (NOV/FOV) to Cleveland Thermal, LLC. This NOV/FOV is issued in accordance with Section 113(a) of the Clean Air Act (the Act), 42 U.S.C. § 7413(a).

EPA has determined that at its Canal steam generation plant, Cleveland Thermal is violating the Prevention of Significant Deterioration and Non-Attainment New Source Review requirements under the Ohio State Implementation Plan (SIP), Parts C and D of the Act, and federal regulations at 40 C.F.R. §§ 52.21 and 52.24; the New Source Performance Standards under Section 111 of the Act, 42 U.S.C. § 7411; and the Operating Permit requirements under Title V of the Act, 42 U.S.C. §§ 7661 – 7661e.

EPA is offering you an opportunity to confer with us about the violations cited in the NOV/FOV. The conference will give you an opportunity to present information on the specific findings of violations, and the steps you will take to bring the facilities into compliance. Please plan for your technical and management personnel to attend the conference to discuss compliance measures and commitments. You may have an attorney represent you at this conference.

Recycled/Recyclable • Printed with Vegetable Oil Based Inks on 100% Recycled Paper (50% Postconsumer)

The EPA contact in this matter is Katharina Bellairs. You may call her at (312) 353-1669 to request a conference. You should make your request for a conference no later than 10 calendar days after you receive this letter, and we should hold any conference within 30 calendar days of your receipt of this letter.

Sincerely,

Cheryl L. Newton
Director
Air and Radiation Division

Enclosure

cc:     Bob Hodanbosi
        Chief, Division of Air Pollution Control
        Ohio Environmental Protection Agency
        1800 WaterMark Drive
        Columbus, Ohio 43266-1049

        Terrence S. Finn, Esquire
        Roetzel & Andress
        222 South Main Street
        Akron, Ohio 44308

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## REGION 5

IN THE MATTER OF: )
)
**Cleveland Thermal, LLC** ) **NOTICE OF VIOLATION and**
**Cleveland, Ohio** ) **FINDING OF VIOLATION**
)
Proceedings Under the Clean Air Act, ) **EPA-5-11-OH-11**
42 U.S.C. §§ 7401 et. seq. )

## NOTICE AND FINDING OF VIOLATION

The U.S. Environmental Protection Agency is issuing this Notice of Violation and Finding of Violation (NOV/FOV) under Section 113(a)(1) and (3) of the Clean Air Act, 42 U.S.C. § 7413(a)(1) and (3). The authority to issue this NOV/FOV has been delegated to the Regional Administrator of the EPA, Region 5, and redelegated to the Director, Air and Radiation Division. EPA finds that Cleveland Thermal, LLC (Cleveland Thermal) is violating the Clean Air Act (the Act), 42 U.S.C. 7401 -7671q, at its Canal steam generating plant located in Cleveland, Ohio, for constructing a major modification causing a significant increase in sulfur dioxide ($SO_2$), oxides of nitrogen ($NO_x$), particulate matter (PM), PM less than 10 microns ($PM_{10}$), and/or fine PM, or PM less than 2.5 microns ($PM_{2.5}$), without first obtaining a construction permit meeting the Prevention of Significant Deterioration (PSD) or New Source Review (NNSR) requirements in Parts C and D of the Act, the underlying federal regulations, and the Ohio State Implementation Plan (SIP). These modifications also failed to comply with New Source Performance Standards (NSPS) at 40 C.F.R. Part 60, Subpart Db. Finally, we find that you failed to comply with the Act's Title V requirements by not incorporating all applicable requirements into your Title V operating permit.

## Statutory and Regulatory Background

### Prevention of Significant Deterioration

1. The Prevention of Significant Deterioration (PSD) provisions of Part C of Title I of the CAA, 42 U.S.C. §§ 7470-7492, and their implementing regulations at 40 C.F.R. § 52.21 (collectively, "the PSD Program"), establish specific pre-construction requirements applicable to the construction and modification of "major emitting facilities" located in areas designated as either attainment or unclassifiable for purposes of meeting the National Ambient Air Quality Standards (NAAQS).

2. The PSD Program prohibits, among other things, a "major emitting facility" from constructing a "major modification" unless it has obtained a pre-construction PSD permit that applies "Best Available Control Technology" (BACT) to control emissions from the proposed modified emissions unit, and conducts an analysis to determine the air quality impacts of the modification. Sections 165(a) of the Act, and 40 C.F.R. § 52.21(i).

3. Sections 110(a) and 161 of the CAA require each state to adopt a SIP containing regulations implementing the PSD Program.

4.  A state may comply with Sections 110(a) and 161 of the CAA by having its own PSD regulations approved by EPA as part of its SIP, provided that the state PSD regulations are at least as stringent as those set forth at 40 C.F.R. § 51.166.

5.  Under 40 C.F.R. § 52.21(a), if a state does not have PSD regulations that EPA has approved and incorporated into its SIP, EPA may incorporate the federal PSD regulations set forth at 40 C.F.R. § 52.21 into the SIP.

6.  EPA delegated the authority to implement the federal PSD regulations to the State of Ohio by letter dated May 1, 1980. The federal PSD regulations were incorporated into the Ohio SIP on January 29, 1981. 40 C.F.R. § 52.1884 and 46 Fed. Reg. 9580 (January 29, 1981).

7.  On October 10, 2001, EPA conditionally approved the Ohio SIP for PSD provisions for attainment areas. 66 Fed. Reg. 51570. On January 22, 2003, EPA approved the remaining portions of Ohio's PSD provisions. 68 Fed. Reg. 2909. Ohio's PSD program is located in Ohio Administrative Code (OAC) Rules 3745-31-01 through 3745-31-20. These rules mirror the federal PSD regulations codified in 40 C.F.R. in the 1999 edition of the Code of Federal Regulations (C.F.R.). Citations in this NOV/FOV provide, as appropriate, both federal and State SIP citations. The general provisions found at OAC Rules 3745-31-01 to 3745-31-10 apply to both attainment and non-attainment areas.

8.  Facilities in Ohio were required to comply with the delegated federal PSD program prior to October 10, 2001. Facilities in Ohio are required to comply with the approved Ohio PSD program on and after October 10, 2001.

9.  On February 25, 2010, EPA partially approved revisions to Ohio's PSD and nonattainment NSR (NNSR) construction permit programs to address "NSR Reform" regulations promulgated on December 31, 2002. 67 Fed. Reg. 80186. The revisions to the Ohio SIP became effective on March 29, 2010. For purposes of the SIP, the applicable regulations are those regulations that were in effect during the time period when a source should have applied for and obtained a construction permit. The physical and operational changes identified in this NOV/FOV were made prior to the effective date of NSR Reform amendments to the Ohio SIP.

10. The PSD regulations set forth in 40 C.F.R. § 52.21 apply to any "major stationary source" that intends to construct a "major modification in an attainment or unclassifiable area." 40 C.F.R. § 52.21(i)(2).

11. For purposes of attainment areas, 40 C.F.R. § 52.21(b)(1)(i)(a) (1999) and OAC Rule 3745-31-01(SS)(2)(xvi) define "major stationary source" as any stationary source within one of 28 source categories which emits, or has the potential to emit, 100 tons per year or more of any air pollutant subject to regulation under the Act, including fossil-fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input (MMBtu/hour) are included among the 28 source categories.

12. 40 C.F.R. § 52.21(b)(2)(i) (1999) and OAC Rule 3745-31-01(RR) define "major modification" as any physical change in or change in the method of operation of a major stationary source that would result in a "significant net emissions increase" of any pollutant subject to regulation under the Act.

2

13. 40 C.F.R. § 52.21(b)(3)(i) (1999) and OAC Rule 3745-31-01(YY) define "net emissions increase" as the amount by which the sum of the following exceeds zero:
    (a) Any increase in actual emissions from a particular physical change or change in method of operation at a stationary source; and
    (b) Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

14. 40 C.F.R. § 52.21(b)(21)(iv) (1999) and OAC Rule 3745-31-01(B)(3) define "actual emissions" and state that for any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit (PTE) of the unit on that date.

15. 40 C.F.R. § 52.21(b)(23)(i) (1999) and OAC Rule 3745-31-01(SSS) define "significant" in reference to a "net emissions increase" of the following air pollutants, NOx, $SO_2$, PM, carbon monoxide (CO), hydrogen sulfide ($H_2S$), and Total Reduced Sulfur (TRS) as: an emissions rate that would equal or exceed 40 tons or more per year of NOx, 40 tons or more per year of $SO_2$, 25 tons or more per year of PM, 100 tons or more per year of CO, 10 tons or more per year of $H_2S$, and 10 tons or more per year of TRS.

16. "Best available control technology" means an emission limitation reflecting the maximum degree of reduction of each regulated PSD pollutant which the permitting authority determines is achievable for a facility on a case-by-case basis, taking into account energy, environmental and economic impacts and other costs. Section 169(3) of the Act; OAC Rule 3745-31-01(M).

17. To construct a "major modification" in an attainment area, a "major stationary source" must, among other things, obtain a PSD permit, install and operate BACT control devices for each regulated PSD pollutant for which the medication would result in a significant net emissions increase, and conduct an analysis to determine the air quality impacts of the proposed modification. 40 C.F.R. § 52.21(i), (j) and (k); OAC Rule 3745-31-15.

18. Under 40 C.F.R. § 52.2(i)(1), and OAC Rule 3745-31-13(A), no major stationary source shall begin actual construction of a major modification without a valid PSD permit.

19. An applicant for a permit to modify a stationary source is required to submit all information necessary to allow the permitting authority to perform any analysis or make any determination required in order to issue the appropriate permit. 40 C.F.R. § 52.21(n) (1999). See also, OAC Rule 3745-31-05(E)(1) and OAC Rule 3745-31-12(B).

20. Any owner or operator of a source subject to 40 C.F.R. § 52.21(1999) who commences construction or modification after the effective date of the PSD regulations without applying for and receiving a valid PSD permit, shall be subject to appropriate enforcement action. 40 C.F.R. § 52.21(r)(1), § 52.23(r) (1999), and Section 113 of the CAA.

## Non-Attainment New Source Review

21. In accordance with Section 165 of the CAA, for PSD purposes, the requirements pertaining to particulate matter less than 2.5 micrometers ($PM_{2.5}$) become effective for this new NAAQS upon the effective date of the NAAQS. For PSD and Non-attainment New Source Review (NNSR), the requirements for $PM_{2.5}$ become effective on April 5, 2005. See 73 Fed. Reg. 28321, 28340, (May 16, 2008); 70 Fed. Reg. 65984, 66043 (Nov. 1, 2005).

3

22. The Non-attainment New Source Review provisions of Part D of the Act, §§ 171-193, 42 U.S.C. 7501-7515, require preconstruction review and permitting for modifications of stationary sources located in non-attainment areas. Under the applicable regulations, if a major stationary source located in a non-attainment area is planning to make a major modification, then that source must obtain a NNSR permit before beginning actual construction. To obtain this permit, the source must, among other things, comply with the Lowest Achievable Emission Rate (LAER) and provide offsetting emission reductions. CAA § 173, 42 U.S.C. § 7503.

23. Section 110 of the CAA, 42 U.S.C. § 7410, requires each state to submit to EPA a plan for the implementation, maintenance and enforcement of the NAAQS, including a permit program as required by Part D of the CAA. On July 23, 1980, and September 25, 1980, OEPA submitted its NNSR plan designed to meet the non-attainment area requirements of Title I, Part D of the CAA. EPA conditionally approved this plan on October 31, 1980. 45 Fed. Reg. 72119 (codification corrected on December 17, 1980, at 45 Fed. Reg. 82927).

24. To satisfy the conditional approval, OEPA submitted a request to incorporate 40 C.F.R. Part 51, Appendix S, as the Ohio NNSR plan. EPA granted limited approval of the revised regulations on September 8, 1993. 58 Fed. Reg. 47211.

25. On January 10, 2003, EPA fully approved the Ohio's NNSR SIP rules, codified at Ohio Administrative Code (OAC) Rules 3745-31-21 through 3745-31-27. 68 Fed. Reg. 1366.

26. "Major modification," "major stationary source," "net emissions increase" and "significant" are defined in the Ohio NNSR SIP provisions as they are defined in Ohio's PSD SIP provisions at OAC Rule 3745-31-01.

27. Section 182(f) of the Act, 42 U.S.C. § 7511a(f), and OAC Rule 3745-31-26(B), state that $NO_x$ is a nonattainment air pollutant for any area designated nonattainment for ozone.

28. OAC Rule 3745-31-22(A)(l) requires that permits allowing major modifications at major stationary sources in non-attainment areas include an emission limit that is the LAER for such a stationary source. OAC Rule 3745-31-01(OO)(1) and (2) and 40 C.F.R. § 51.165(a)(1)(xiii)(A) and (B) define "LAER" as the more stringent of the following two options:

    1)    The most stringent emissions limitation that is contained in the implementation plan of any state for such class or category of stationary source, unless the owner or operator of the proposed stationary source demonstrates that such limitations are not achievable; or

    2)    The most stringent emissions limitation that is achieved in practice by such class or category of stationary source. This limitation, when applied to a modification, means the lowest achievable emissions rate for the new or modified emissions units within the stationary source.

29. OAC Rule 3745-3l-22(A)(2) also requires an owner or operator applying for a permit for a major modification to a major stationary source in a non-attainment area to certify that all other existing major stationary sources that it owns or operates in Ohio are in compliance with all applicable emission limitations and standards under the CAA or with a federally enforceable or court decreed compliance schedule.

30. OAC Rule 3745-31-22(A)(3) requires an owner or operator applying for a permit for a major modification to a major stationary source in a non-attainment area to offset the increased emissions by reducing emissions from existing air contaminant sources in the same area.

31. OAC Rule 3745-31-21(A) prohibits or operators of major stationary sources from beginning construction of a major modification without first meeting the non-attainment NSR requirements in Ohio SIP Rules OAC 3745-31-21 through 3745-31-27.

32. Any owner or operator of a source subject to the NNSR provisions of Part D of the Act, and the underlying federal and Ohio SIP provisions, who commences construction or modification after the effective date of those regulations without applying for and receiving a NNSR permit, shall be subject to appropriate enforcement action. Section 113 of the CAA.

## Requirements for SIP Permits to Install

33. OAC Rule 3745-31-02(A) states that no person shall cause, permit, or allow the installation of a new source of air pollutants or allow the modification of an air containment source without first obtaining a permit to install from the director.

34. OAC 3745-31-05 provides that the director shall issue a permit to install if he determines that, among other things, the modification will not result in a violation of applicable laws.

35. OAC 3745-31-01(F) defines "applicable laws" to include the Act and applicable federal regulations thereunder, and the Ohio SIP, including OAC 3745-31-13(A) and OAC 3745-31-2 1(A).

## Title V Permitting Requirements

36. Section 502(a) of the Act, 42 U.S.C. § 7661a(a), provides that no source may operate without a Title V permit after the effective date of any permit program approved or promulgated under Title V of the Act. EPA first promulgated regulations governing state operating permit programs on July 21, 1992. *See* 57 Fed. Reg. 32295; 40 C.F.R. Part 70. EPA promulgated regulations governing the federal operating permit program on July 1, 1996. *See* 61 Fed. Reg. 34202; 40 C.F.R. Part 71.

37. Section 503 of the Act, 42 U.S.C. § 7661b, sets forth the requirement to timely submit an application for a permit, including information required to be submitted with the application.

38. Section 504(a) of the Act, 42 U.S.C. § 7661c(a), requires that each Title V permit include enforceable emission limitations and standards, a schedule of compliance, and other conditions necessary to assure compliance with applicable requirements, including those contained in a state implementation plan. 42 U.S.C. § 766lc(a).

39. EPA promulgated full approval of the Ohio's Title V program on August 15, 1995. *See* 40 C.F.R. Part 70, Appendix A; 60 Fed. Reg. 42045. Ohio's Title V program became effective on October 1, 1995. 60 Fed. Reg. 42045.

40. 40 C.F.R. § 70.3 provides that the requirements of Part 70 apply to any major source located in a state that has received whole or partial approval of its Title V program. The Ohio regulations

5

governing the Title V permitting program are codified at OAC Rule 3745-77, and are federally enforceable under Section 113(a)(3) of the Act.

41. 40 C.F.R. § 70.1(b) and OAC Rule 3745-77-07(A) provide that all Title V sources shall have a permit to operate that assures compliance by the source with all applicable requirements.

42. 40 C.F.R § 70.2 and OAC Rule 3745-77-01(H) define "applicable requirement" to include "(1) any standard or other requirement provided for in the applicable implementation plan approved or promulgated by EPA through rulemaking under title I of the Act that implements the relevant requirements of the Act, including revisions to that plan promulgated in part 52. . .".

43. OAC Rule 3745-77-02(A) provides that no Title V source may operate without a permit as specified in the chapter.  *See* 40 C.F.R. § 70.7(b).

44. OAC Rule 3745-77-02(A) requires timely and complete permit applications for Title V permits with required information that must be submitted. *See* 40 C.F.R. § 70.5(a) and (c).

45. OAC Rule 3745-77-02(A) provides that "the owner or operator of the Title V source shall not operate such source after the date that a timely and complete Title V permit application is required to be submitted, except in compliance with a permit issued under this Chapter." *See* 40 C.F.R. § 70.7(b).

46. OAC Rule 3745-77-03(F) provides that "[a]ny applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application shall, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information. In addition, an applicant shall provide additional information as necessary to address any requirements that become applicable to the source after the date it filed a complete application but prior to release of a draft permit." *See* 40 C.F.R. § 70.5(b).

## New Source Performance Standards (NSPS): Subpart Db

47. Under Sections 111 and 114 of the Act, 42 U.S.C. 7411 and 7414, EPA promulgated the general provisions of the New Source Performance Standards (NSPS), which are codified at 40 C.F.R. Part 60, Subpart A, 60.1 - 60.19.

48. Under the NSPS general provisions, any physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which an NSPS applies shall be considered a modification. Upon modification, an existing facility shall become subject to the NSPS for each pollutant to which the NSPS applies.  40 C.F.R. § 60.14.

49. Under Sections 111 and 114 of the Act, 42 U.S.C. 7411 and 7414, EPA promulgated NSPS, Subpart Db, which applies to, among other things, any steam generating unit capable of combusting between 100 and 250 MMBtu/hr that is modified after June 19, 1984.  Under Subpart Db, "steam generating unit" means, among other things, a device that combusts any fuel and produces steam or heats water or heats any heat transfer medium. 40 C.F.R. § 60.41b.

50. 40 C.F.R. § 60.40b of Subpart Db states, "the affected facility to which this subpart applies is each steam generating unit that commences construction, modification, or reconstruction after June 19, 1984, and that has a heat input capacity from fuels combusted in the steam generating

unit of greater than 29 megawatts (MW) (100 million British thermal units per hour (MMBtu/hr))."

51. 40 C.F.R. § 60.2 of the general provisions of the NSPS states that "[m]odification means any physical change in, or change in the method of operation of, an existing facility which increases the amount of any air pollutant (to which a standard applies) emitted into the atmosphere by that facility or which results in the emission of any air pollutant (to which a standard applies) into the atmosphere not previously emitted."

52. 40 C.F.R. § 60.11(d) of the general provisions of the NSPS states that, "[a]t all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions. Determination of whether acceptable operating and maintenance procedures are being used will be based on information available to the Administrator which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source."

53. 40 C.F.R. § 60.42b(k)(1) of Subpart Db states "...no owner or operator of an affected facility that commences construction, reconstruction, or modification after February 28, 2005, and that combusts coal ... shall cause to be discharged into the atmosphere any gases that contain $SO_2$ in excess of 87 ng/J [nanograms per joule] (0.20 lb/MMBtu) heat input or 8 percent (0.08) of the potential $SO_2$ emission rate (92 percent reduction) and 520 ng/J (1.2 lb/MMBtu) heat input."

54. 40 C.F.R. § 60.43b(h)(1) of Subpart Db states "...no owner or operator of an affected facility that commenced construction, reconstruction, or modification after February 28, 2005, and that combusts coal ... shall cause to be discharged into the atmosphere from that affected facility any gases that contain PM in excess of 13 ng/J (0.030 lb/MMBtu) heat input..."

## Factual Background

55. Cleveland Thermal is located in Cleveland, Cuyahoga County, Ohio.

56. Cleveland Thermal owns and operates the Canal Plant, located in Cleveland, Ohio.

57. The Canal Plant is a coal-fired steam generating station that consists of three operational chain-grate wet-bottom boilers, B101, B102, and B104, originally constructed in 1948. Each boiler has a capacity to generate 228 British thermal units per hour heat input (MMBtu/hour).

58. From April 5, 2005 to the present Cleveland Thermal was located in an area designated nonattainment for $PM_{2.5}$. 70 Fed. Reg. 944 (January 5, 2005); 40 C.F.R. § 81.336.

59. From June 15, 2004 to September 15, 2009, Cleveland Thermal was located in an area designated nonattainment for 8-hour ozone. 60 Fed. Reg. 23858 (April 30, 2004); 60 Fed. Reg. 47414 (September 15, 2009); 40 C.F.R. § 81.336.

60. At all other times relevant to this NOV/FOV, Cuyahoga County was classified in attainment for $PM_{10}$, 1-hour ozone, $NO_x$, and $SO_2$. 40 C.F.R. § 81.336.

61. The Ohio Environmental Protection Agency (Ohio EPA) issued Title V Permit P0094245 (Title V Permit) to Cleveland Thermal on January 16, 2003.

62. The Canal Plant is a coal-fired steam generating station that has the potential to emit more than 100 tons per year each of PM, $SO_2$ and $NO_x$.

63. The Canal Plant is a fossil fuel-fired steam electric plant of more than 250 MMBtu/hour, and is therefore a "major stationary source" within the meaning of 40 C.F.R. § 52.21(b)(1)(i)(a) and OAC Rule 3745-31-01(SS)(2)(xvi), and a "major emitting facility" within the meaning of Section 169(1) of the Act, 42 U.S.C. § 7479(1).

64. Cleveland Thermal completed the following physical changes and/or changes in the method of operation at the Canal Plant:
    a.  Complete Economizer Re-tube, Boiler B101, April 2006; and
    b.  Partial Economizer Re-tube, Boiler B104, June 2005.

65. Each of the physical changes and/or changes in the method of operation identified in Paragraph 64 resulted in a significant net emissions increase, as defined at 40 C.F.R. § 52.21(b)(3)(i) and OAC Rule 3745-31-01(YY), and 40 C.F.R. § 52.21(b)(23)(i) and OAC Rule 3745-31-01(SSS), of $SO_2$, $NO_x$, and PM, $PM_{10}$ and/or $PM_{2.5}$.

66. Each of the projects and/or changes in the method of operation identified in Paragraph 64 constitute a "major modification," as that term is defined at 40 C.F.R. § 52.21(b)(2)(i), OAC Rule 3745-31-01(RR), and 40 C.F.R. Part 51, Appendix S.

67. Each of the projects and/or changes in the method of operation identified in Paragraph 64 constitutes a "modification," as that term is defined at 40 C.F.R. § 60.2.

68. After completion of the projects and/or changes in the method of operation identified in Paragraph 64, Boilers B101 and B104 stack tested numerous times above the 0.030 lb PM/MMBtu standard set forth in Subpart Db.

69. Boilers B101 and B104 have no $SO_2$ controls. Since 2005, the boilers have continuously fired coal with a 0.64 percent, or above, sulfur content; equating to an emissions rate in excess of 0.91 pounds $SO_2$/MMBtu.

## Violations

## Violations of Prevention of Significant Deterioration Requirements

70. The physical changes and/or changes in the method of operation described in Paragraph 64, caused a significant net emissions increase, as defined at 40 C.F.R. § 52.21(b)(3)(i) and (b)(23)(i) and OAC Rule 3745-31-01(YY) and (SSS), of $SO_2$, PM and $PM_{10}$.

71. The projects described in Paragraph 64, each constituted a "major modification," as that term is defined at 40 C.F.R. § 52.21(b)(2)(i) and OAC Rule 3745-31-01(RR).

72. For each of the modifications described in Paragraph 64, Cleveland Thermal failed to apply for or obtain a PSD permit issued in accordance with Section 165 of the Act, including, but not

limited to, compliance with BACT, and the underlying federal and state regulations, including, but not limited to, 40 C.F.R. § 52.21 and OAC Rule 3745-31-11 through 3745-31-20.

73. Each of the violations exists from at least the date of the start of construction of each modification and continues until, among other things, the appropriate PSD permit is obtained and the necessary pollution control equipment is installed and operated.

## Violations of Nonattainment New Source Review Requirements

74. The physical changes and/or changes in the method of operation on Boilers B101 and B104 described in Paragraph 64, caused a significant net emissions increase, as defined at 40 C.F.R. § 52.21(b)(3)(i) and (b)(23)(i) and OAC Rule 3745-31-01(YY) and (SSS) of $NO_x$ and/or $PM_{2.5}$.

75. $NO_x$ is a nonattainment air pollutant for any area designated nonattainment for ozone. The projects described in Paragraph 64 each constitute a "major modification," as that term is defined by OAC Rule 3745-31-01(RR) and 40 C.F.R. Part 51, Appendix S.

76. For the projects described in Paragraph 64, Cleveland Thermal did not install LAER for $NO_x$, PM, and/or $PM_{2.5}$.

77. For the projects described in Paragraph 64, Cleveland Thermal did not offset the significant net emissions increase of $NO_x$ and/or $PM_{2.5}$.

78. For each of the modifications described in Paragraph 64, Cleveland Thermal failed to apply for or obtain a NNSR permit issued in accordance with the following: Section 173 of the Act, 42 U.S.C. § 7503, including, but not limited to, achieving LAER and obtaining offsets of significant net emissions of $NO_x$ and/or $PM_{2.5}$; and the underlying federal and state regulations, including, but not limited to, 40 C.F.R. § 51.165 and OAC Rule 3745-31-02 and OAC Rules 3745-31-21 through 3745-31-27.

79. Each of the violations exists from at least the date of the start of the construction of each modification and continues until, among other things, the appropriate NNSR permit is obtained and the necessary pollution control equipment is installed and operated.

## Violations of the Title V Provisions

80. Each of the facilities identified above is a "major source" as defined in Section 501(2) of the Act, 42 U.S.C. § 7661(2), 40 C.F.R. § 70.2 and OAC Rule 3745-77-01.

81. Since April 2005, Cleveland Thermal has failed to submit timely and complete Title V permit applications for the Canal steam generating station with information pertaining to the modifications identified in Paragraph 64 and with information concerning all applicable requirements, including, but not limited to, the requirement to apply, install and operate BACT or LAER for $NO_x$, $SO_2$, PM, $PM_{10}$, and/or $PM_{2.5}$ at the plants, and also failed to supplement or correct the Title V permit applications for these plants in violation of Sections 502, 503 and 504 of the Act, 42 U.S.C. 7661a, 7661b and 7661c; the regulations at 40 C.F.R. Part 70, including, but not limited to, 40 C.F.R. § 70.1(b), § 70.5(a), (b) and (c), and § 70.6 and § 70.7(b); and the Ohio Title V provisions at OAC Rule 3745-77.

**NSPS Subpart Db**

82. Cleveland Thermal violated and continues to violate NSPS Subpart Db, specifically 40 C.F.R. § 60.11(d) of the General Provisions, by failing to maintain and operate its air pollution control equipment on B101 and B104 in a manner consistent with good air pollution control practice for minimizing emissions.

83. Cleveland Thermal violated and continues to violate NSPS Subpart Db, specifically 40 C.F.R. § 60.42b(k)(1), by discharging into the atmosphere gases that contain $SO_2$ in excess 0.20 lb/MMBtu heat input or 8 percent of the potential $SO_2$ emission rate.

84. Cleveland Thermal violated and continues to violate NSPS Subpart Db, specifically 40 C.F.R. § 60.43b(h)(1), and Section 111(e) of the Act, 42 U.S.C. § 7411(e) by discharging into the atmosphere any gases that contain PM in excess of 0.030 lb/MMBtu heat input.

## Environmental Impact of Violations

85. Excess emissions of $NO_x$ increase ground level concentrations of ozone and nitrogen dioxide, both of which can cause respiratory inflammation, increased difficulty breathing, and lung damage. $NO_x$ emissions also contribute to acid rain, global warming, the formation of fine particles in the atmosphere, water quality deterioration, and visibility impairment.

86. Excess emissions of $SO_2$ increase the amount of acid rain and public exposure to unhealthy levels of $SO_2$. $SO_2$ reacts with other chemicals in the air to form tiny sulfate particles. Long term exposure to high levels of $SO_2$ gas and particles can cause respiratory illness, aggravate existing heart disease, and lead to premature death.

87. Excess emissions of particulate matter, especially fine particulate, contribute to respiratory problems, lung damage and premature deaths.

Dated ___6/29/11___

Cheryl L. Newton
Director
Air and Radiation Division

## CERTIFICATE OF MAILING

I, Tracy Jamison, certify that I sent a Notice of Violation No. **EPA-5-11-OH-11,**

by Certified Mail, Return Receipt Requested, to:

Mark Divis
Cleveland Thermal, LLC
1921 Hamilton Avenue
Cleveland, Ohio 44114-1112

I also certify that I sent a copy of the Request to Provide Information Pursuant to the

Clean Air Act by First Class Mail to:

Robert Hodanbosi
Chief, Division of Air Pollution Control
Ohio Environmental Protection Agency
P.O. Box 1049
Columbus, Ohio 43216-1049

On the 30 day of June 2011.

Tracy Jamison, Administrative Assistant
AECAS (PAS)

Certified Mail Receipt Number: 7009 1680 0000 7670 4533

standard bcc's: official file copy w/attachment(s)

                  originating organization reading file w/attachment(s)

other bcc's:    Mary McAuliffe C-14J (w/attach)

| | |
|---|---|
| Creation Date: | June 27, 2011 |
| Filename: | G:\Air Enforcement And Compliance Branch\MI and WI\Bellairs\Cleveland Thermal PSD NOV-FOV.doc |
| Legend: | ARD:AECAB:AECAS(MI/WI):KRB |